**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------X        **OPINION AND ORDER**
                                           :
In re MERRILL LYNCH & CO., INC.            :        02 MDL 1484(JFK)
RESEARCH REPORTS SECURITIES LITIGATION     :
                                           :        ____
------------------------------------------X

This Document Relates To:

All of the Actions on Schedule 1


**APPEARANCES**


For Class Plaintiffs:

      COHEN MILSTEIN HAUSFELD & TOLL
      1100 New York Avenue, N.W.
      Washington, D.C. 20005
          Of Counsel:   Herbert Milstein, Esq.
                       Joshua Devore, Esq.

      KAPLAN FOX & KILSHEIMER
      805 Third Avenue
      New York, New York 10022
          Of Counsel:   Christine Fox, Esq.
                       Frederic Fox, Esq.


      MURRAY FRANK & SAILER
      275 Madison Avenue
      New York, New York 10016
          Of Counsel:   Jacqueline Sailer, Esq.

      SHAPIRO HABER & URMY
      53 State Street
      Boston, Massachusetts 02109
          Of Counsel:   Edward Haber, Esq.
                       Todd Heyman, Esq.


For Defendants:

CLIFFORD CHANCE, LLP
31 West 52nd Street
New York, New York 10019
        Of Counsel:    Mark Holland, Esq.
                       Mary K. Dulka, Esq.

FOLEY & LARDNER
90 Park Avenue
New York, New York 10016
        Of Counsel:    Marc Dorfman, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, New York 10036
        Of Counsel:    Jay Kasner, Esq.
                       Scott Musoff, Esq.
                       Edward Yodowitz, Esq.
                       Joanne Gaboriault, Esq.

For Objector New York State Teachers' Retirement System:

NEW YORK STATE TEACHERS' RETIREMENT SYSTEM
10 Corporate Woods Drive
Albany, New York 12211-2395
        Of Counsel:    Joseph Indelicato, Jr., Esq.

**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

This Opinion considers the petition of the lead plaintiffs for class certification and final approval of a proposed settlement and plan of allocation in twenty putative securities class actions brought on behalf of direct purchasers of securities that were the subject of allegedly false or misleading Merrill Lynch research reports.  The Court also considers Lead Counsels' application for an award of attorneys' fees and reimbursement of litigation expenses.  For the reasons that follow, the Court (i) grants class certification to the settling plaintiffs, (ii) approves the settlement and plan of allocation, (iii) awards attorneys' fees in the amount of 24% of the settlement fund, and (iv) awards reimbursement of litigation expenses to counsel.

**BACKGROUND**

These twenty securities class actions (collectively, the "Actions") were among numerous securities class actions brought against Merrill Lynch on behalf of classes of direct purchasers of stock in Internet-based companies that were the subject of allegedly misleading research reports written and disseminated by the defendants.  The cases originally were assigned to the late Honorable Milton J. Pollack for pre-trial purposes, in In re Merrill Lynch & Co., Inc. Research Reports

3

<u>Sec. Litig.</u>, 02 MDL 1484, pursuant to an order of the Judicial
Panel on Multidistrict Litigation ("MDL") which consolidated
before Judge Pollack numerous claims, alleging securities fraud
against Merrill Lynch and other defendants.  The cases were
reassigned to me upon Judge Pollack's death.  This is the second
global settlement of the cases consolidated under this MDL.  The
first global settlement involved three consolidated cases,
relating to claims brought on behalf of shareholders of three
different Merrill Lynch proprietary mutual funds (the "Mutual
Fund Cases") and was approved by this Court on February 1, 2007.
See <u>In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.</u>,
02 MDL 1484 (JFK), 2007 U.S. Dist. LEXIS 9450 (S.D.N.Y. Feb. 1,
2007) (the "MF Decision").

Plaintiffs in these Actions are shareholders who held
stock, during the relevant class periods, in twenty different
internet-based companies that were the subject of allegedly false
and/or misleading Merrill Lynch research reports.[1]  Defendants

_____

[1]The twenty Actions, each of which relates to a different
security, are: <u>All Aboard the Training Junction v. Merrill Lynch
& Co.</u>, No. 03 Civ. 2927; <u>In re Merrill Lynch & Co. Aether Systems
Inc. Research Reprots Sec. Litig.</u>, No. 02 Civ. 3429; <u>In re
Merrill Lynch & Co. CMGI Inc. Research Reports Sec. Litig.</u>, No.
02 Civ. 7218; <u>In re Merrill Lynch & Co. Etoys Inc. Research
Reports Sec. Litig.</u>, No. 02 Civ. 6645; <u>In re Merrill Lynch & Co.
Excite@Home Research Reports Sec. Litig.</u>, No. 02 Civ. 3042; <u>In re
Merrill Lynch & Co. Exodus Communs., Inc. Research Reports Sec.
Litig.</u>, No. 02 Civ. 6914; <u>In re Merrill Lynch & Co. GoTo.com
Research Reports Sec. Litig.</u>, No. 02 Civ. 3835; <u>In re Merrill
Lynch & Co. Homestore.com Research Reports Sec. Litig.</u>, No. 02
Civ. 9931; <u>In re Merrill Lynch & Co. InfoSpace Analyst Reports</u>

are Merrill Lynch & Co., Inc.; Merrill Lynch's broker-dealer
affiliate, Merrill Lynch, Pierce, Fenner & Smith Incorporated
("MLPF&S"); and various Merrill Lynch research analysts,
including Henry Blodgett, a Merrill Lynch vice president and the
primary analyst for companies in the Internet sector.[2]
Plaintiffs alleged that the favorable ratings given by Merrill
Lynch's analysts to the Internet-based stocks at issue were
materially misleading and the result of a conflict of interest
between Merrill Lynch's research and investment banking
operations.  Plaintiffs claimed that the defendants' conduct
violated Sections 10(b) and 20(a) and Rule 10b-5 of the

---

Sec. Litig., No. 01 Civ. 6881; In re Merrill Lynch & Co. Internet
Capital Group, Inc. Researech Reports Sec. Litig., No. 02 Civ.
3050; In re Merrill Lynch & Co. iVillage Inc. Research Reports
Sec. Litig., No. 02 Civ. 6637; In re Merrill Lynch & Co.
Lifeminders Research Reports Sec. Litig., No. 02 Civ. 9852; In re
Merrill Lynch & Co. LookSmart, Ltd. Research Reports Sec. Litig.,
No. 02 Civ. 7739; In re Merrill Lynch & Co. Openwave Systems,
Inc. Research Reports Sec. Litig., No. 02 Civ. 3252; In re
Merrill Lynch & Co. Pets.com, Inc. Research Reports Sec. Litig.,
No. 02 Civ. 3634; In re Merrill Lynch & Co. Quokka Sports, Inc.
Research Reports Sec. Litig. No . 02 Civ. 7585; In re Merrill
Lynch & Co. B2B HOLDRs Sec. Litig., No. 02 Civ. 5002; In re
Merrill Lynch & Co. Internet Architecture HOLDRs Sec. Litig., No.
02 Civ. 3606; In re Merrill Lynch & Co. Internet HOLDRs Sec.
Litig., No. 02 Civ.5961; In re Merrill Lynch & Co. Internet
Infrastructure HOLDRs Sec. Litig., No. 02 Civ. 4242.

[2]The defendants, as defined in the Stipulation of
Settlement, are Merrill Lynch & Co., Inc., MLPF&S, B2B HOLDRs/SM
Trust, Internet Architecture HOLDRs/SM Trust, Internet HOLDRs/SM
Trust, Internet Infrastructure HOLDRs/SM Trust, Henry M.
Blodgett, Virginia Syer Genereux, John L. Steffens, E. Stanley
O'Neal, George A. Schieren, Ahmass L. Kakahany, Thomas A.
Patrick, Dominic A. Carone, and Michael J. Castellano.

Securities Exchange Act of 1934.  The factual background of the Actions and the plaintiffs' claims are set forth in previous decisions and orders of Judge Pollack, including In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243 (S.D.N.Y. 2003) and In re Merrill Lynch & Co. Research Reports Sec. Litig., 289 F. Supp. 2d 429 (S.D.N.Y. 2003); in Judge Pollack's decision and order in a related class action case, In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351 (S.D.N.Y. 2003); and in the MF Decision.  Familiarity with those decisions is assumed.

*Procedural History*

The first of these Actions commenced on July 26, 2001, with the filing of a complaint on behalf of shareholders of the stock InfoSpace (the "InfoSpace Complaint").  The InfoSpace Complaint alleged that the defendants had recommended the purchase of InfoSpace stock despite being in possession of negative material information regarding an impending merger of InfoSpace and Go2Net, another internet company.  On April 8, 2002, while the defendants' motion to dismiss the InfoSpace Complaint was pending, the Office of the New York Attorney General (the "NYAG") submitted an affidavit in New York Supreme Court, in support of the NYAG's attempt to compel the defendants' to produce certain records (the "Dinallo Affidavit").  The Dinallo Affidavit alleged in detail the defendants' practice of

regularly publishing misleading and/or false recommendations on Internet-based stocks in order to generate investment banking business for Merrill Lynch.  The NYAG's investigation into Merrill Lynch's conduct received a great deal of publicity and led to the filing of over one hundred class action complaints, in courts throughout the country, on behalf of purchasers of approximately two dozen Internet-based securities that had been the subject of allegedly false Merrill Lynch research reports. In October 2002, the Judicial Panel on Multidistrict Litigation transferred all the cases to Judge Pollack for pre-trial proceedings, under the caption <u>In re Merrill Lynch Research Reports Securities Litigation</u>, No. 02 MDL 1484.

On December 9, 2002, Judge Pollack issued Case Management Order #1, directing that the cases be consolidated according to the security that was the subject of each complaint. On February 5, 2003, March 31, 2003, and July 22, 2003, Judge Pollack issued Orders that, among other things, appointed Lead Plaintiffs in each of the twenty Actions; appointed firms to act as Lead Counsel in these Actions[3]; appointed the Co-Chairs of a

---

[3]The law firms designated as Lead Counsel are: Kaplan Fox & Kilsheimer LLP; Shapiro Haber & Urmy LLP; Murray Frank & Sailer LLP, Cohen Milstein Hausfeld & Toll, P.L.L.C.; Finkelstein Thompson LLP; Pomerantz Haudek Block Grossman & Gross LLP; Weiss & Lurie; and Much Shelist Freed Denenberg Ament & Rubinstein, P.C.

Plaintiffs' Executive Committee (the "Co-Chairs")[4]; and appointed Liasion Counsel[5].

On March 13, 2003, Lead Plaintiffs filed consolidated amended complaints in each of the Actions.   On April 30, 2003, the defendants filed motions to dismiss the complaints in two cases designated as "test cases" by Judge Pollack, In re Merrill Lynch 24/7 Real Media Inc. Research Reports Sec. Litig. No. 02 Civ. 3210 (MP), and In re Merrill Lynch Interliant Inc. Research Reports Sec. Litig., No. 02 Civ. 3221 (MP) (the "Test Cases"). On June 30, 2003, Judge Pollack dismissed the complaints in the Test Cases with prejudice, on the grounds, inter alia, that the plaintiffs had failed adequately to plead loss causation; that the plaintiffs had failed to plead fraud with sufficient particularity; and that the complaints were untimely, because the plaintiffs had been put on inquiry notice more than one year before the commencement of the actions. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 273 F. Supp. 2d 351 (S.D.N.Y. 2003).   Lead Plaintiffs in the Test Cases filed a motion for reconsideration of the statute of limitations ruling and for leave to amend the complaints.   Judge Pollack denied those motions, and the plaintiffs timely appealed.

---

[4]The Co-Chairs of the Executive Committee are:  Shapiro Haber & Urmy LLP;  Murray Frank & Sailer LLP; and Cohen Milstein Hausfeld & Toll, P.L.L.C.

[5]Liaison Counsel is Kaplan Fox & Kilsheimer LLP.

The defendants then filed motions to dismiss nine of the Actions (the "Phase I Cases").  On October 29, 2003 and November 17, 2003, Judge Pollack dismissed the Phase I Cases with prejudice, and Lead Plaintiffs in those cases timely filed notices of appeals.  Those appeals were pending at the time the parties agreed upon the instant settlement.

On December 8, 2003, the defendants moved to dismiss the complaints in seven additional Actions (the "Phase II Cases").  Those motions to dismiss were pending at the time the parties agreed upon a settlement.

Four of the instant Actions, brought on behalf of purchasers of Merrill Lynch-created "baskets" of Internet-based securities (the "HOLDRs Cases"), were not subjected to motions to dismiss.

On October 6, 2004, following Judge Pollack's death, the Judicial Panel for Multidistrict Litigation reassigned the cases consolidated in In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 02 MDL 1484, including these Actions, to this Court.

On January 20, 2005, the Second Circuit issued its decision in the appeal of Judge Pollack's dismissal-with-prejudice of the Test Cases.  In Lentell v. Merrill Lynch, 396 F.3d 161 (2d Cir. 2005), cert. denied, 126 S. Ct. 421 (2005), the

9

Circuit affirmed Judge Pollack's dismissal on the ground of loss causation. Id. at 178.  The Second Circuit, however, reversed Judge Pollack's ruling that the claims were time-barred.

Appeal of the dismissals of the Phase I cases had been stayed pending the Circuit's ruling in the appeal of the dismissals of the Test Cases.  On June 21, 2005, the Circuit lifted the stay of the appeal in the Phase I cases.

*Settlement*

The parties began conducting settlement discussions prior to the Second Circuit's ruling in Lentell.  The first settlement discussion occurred on October 1 ,2003.  Counsel for the defendants and the Co-Chairs continued settlement discussions throughout 2004 and 2005.  On February 16, 2006, the Co-Chairs and the defendants came to a preliminary agreement regarding settlement of the Actions, and the terms of that preliminary agreement were set forth in a letter of understanding.  The preliminary agreement called for a cash payment of $125 million, with interest to begin accruing at rate equal to the three-month London Offered Interbank Rate ("LIBOR") rate as of March 30, 2006.  On January 11, 2007, the parties executed a Stipulation and Agreement of Settlement ("Stipulation").  The parties submitted the Stipulation to the Court, along with a Proposed Preliminary Order Approving the Settlement ("Preliminary Order"), to which were attached as exhibits a "Notice of Pendency and

Proposed Settlement of Class Actions ("Notice"), a Proof of Claim and Release Form ("Proof of Claim"), and a Summary Notice of Proposed Class Action Settlement and Hearing Thereon ("Summary Notice").

The Stipulation provides for the cash payment of $125 million plus accruing interest[6] (the "Settlement Fund").  The Stipulation defines the classes in each of the Actions as consisting of persons who purchased one or more of the securities that are the subject of the instant Actions during the relevant class period for each security and who do not exclude themselves from the Settlement (collectively, the "Class Members").

Pursuant to the Stipulation, the Settlement Fund will be used to pay taxes and tax expenses; administrative costs of the Actions, including the costs of providing notice; and attorneys' fees and litigation expenses.  The remaining amount of the Settlement Fund ("Net Settlement Fund") then will be distributed to valid claimants pursuant to the Plan of Allocation.  The Stipulation also contains a release and waiver, barring any participating Class Members from bringing against any

---

[6]Interest was calculated at the three-month LIBOR rate as of March 30, 2006 and accrued from March 30, 2006 to February 23, 2007.  On February 23, 2007, the Settlement Fund was deposited into escrow accounts, pursuant to the Stipulation, and will continue to accrue interest until the Settlement Fund is distributed to the classes.  As of June 15, 2007, the Settlement Fund's value was $133,310,871.08.

defendant or former defendant in these Actions any future claims, known or unknown, that arise out of or relate to the Actions.

Plaintiffs moved for preliminary approval of the Settlement on January 17, 2007.  On January 24, 2007, the Court entered the Preliminary Order.  The Preliminary Order granted preliminary class certification to the Actions for settlement purposes and certified the Lead Plaintiffs in the Actions as class representatives.  The Preliminary Order also approved the form of the proposed Notice, the Proof of Claim, and the Summary Notice, and scheduled a Fairness Hearing for July 18, 2007, 2006.[7]  The Preliminary Order directed counsel to send the Notice and Proof of Claim via first class mail, no later than March 20, 2007, to all identifiable potential Class Members and further directed counsel to publish the Publication Notice in The Wall Street Journal, USA Today, and on the PR Newswire within two weeks after mailing of the Notice.  The Preliminary Order required any Class Member who wished to be excluded from the Settlement to mail notice of the request for exclusion by May 4, 2007.  The Preliminary Order further required any objection to the Settlement to be filed with the Court and served on the

---

[7]The date of the Fairness Hearing was subsequently adjourned to July 25, 2007.

parties no later than May 4, 2007.  The Order also stated that the deadline for submission of claims was August 31, 2007.[8]

*Notice to Class*

On April 3, 2007, pursuant to the Preliminary Order, counsel, through the Court-approved claims administrator, Analytics, Inc. ("Analytics"), began the process of identifying potential Class Members and mailing claim packets to identifiable class members.  Each claim packet contained the Notice and the Proof of Claim.  As of June 27, 2007, Analytics mailed 1,818,781 claim packets to potential Class Members.  On April 16, 2007, Analytics published the Summary Notice in the national editions of The Wall Street Journal and USA Today, and on the PR Newswire. Analytics also posted downloadable copies of the Notice and Proof of Claim on Analytics' website and on a website created for purposes of the Settlement(http://www.merrilllynchsettlement.com) (last visited August 22, 2007).

The Notice provided a background of the Actions, described the circumstances leading up to the Settlement, supplied the details of the Settlement, gave notice of the

---

[8]By Order dated March 13, 2007, the Court extended the deadline for the mailing of Notice to April 3, 2007 and the deadline for the filing of exclusions and objections by Class Members to May 18, 2007.  By further Order dated August 31, 2007, 2007, the Court extended the deadline for the filing of claims to October 31, 2007, for a group of approximately 11,000 potential claimants whose names were not received by Analytics until July 31, 2007.

Fairness Hearing, and provided instructions for Class Members regarding submissions of claims, exclusion from the Settlement, objection to the terms of Settlement and/or the application for attorneys' fees and reimbursement of expenses, and attendance at the Fairness Hearing.  The Notice also stated that Lead Counsel would apply for attorneys' fees not to exceed 30% of the Settlement Fund, and reimbursement of attorneys' costs and expenses incurred in connection with the litigation of the Actions not to exceed $1,750,000.

*Plan of Allocation*

The Notice included the proposed Plan of Allocation. The Notice explains that, under the Plan of Allocation, the Net Settlement Fund will be distributed to those Class Members who submit timely, valid Proof of Claim forms that demonstrate net losses on transactions of the stocks at issue in the Actions during the relevant class periods.  Under the Plan of Allocation, a percentage, ranging from 0.6% to 20.4%, of the Net Settlement Fund was allocated to each Action.  The allocation of the Net Settlement Fund among the Actions was based on the recommendations of Judge Layn Phillips, a retired United States District Judge, whom Lead Counsel retained to assist in formulating the Plan of Allocation.  Pursuant to a stipulation among Lead Counsel, counsel in each of the Actions submitted to Judge Phillips an opening and reply brief in which counsel

14

asserted the relative strengths of plaintiffs' positions in each Action and argued in support of as large a percentage of the allocation as possible.  In addition, counsel appeared before Judge Phillips for oral argument.  After hearing oral argument, Judge Phillips issued a final recommendation regarding the allocation of the settlement proceeds among the Actions.  The allocation was based on an assessment of the relative likelihood, in each Action, that plaintiffs would be able to prove liability and the amount of damages that could have been recovered for the relevant class periods in each Action.  Lead Counsel stipulated to be bound by Judge Phillips' final allocation recommendations, subject to this Court's final approval.

The Notice sets forth in detail the percentage of the Net Settlement Fund that will be allocated to each Action and the Recognized Loss amount that Class Members in each Action will be entitled to claim.  The Recognized Loss for each Class Member is based on when the Class Member purchased the shares at issue; when the shares were sold; the amount of loss incurred; and the number of shares, if any, held by the Class Member at the end of the relevant class period.

*Reaction of Class to the Notice of Proposed Settlement*

The response of the classes to the proposed settlement has been extremely positive.  After mailing over 1.8 million claim packets to potential Class Members, as of June 27, 2007,

Analytics received only 299 requests for exclusion.  As of July 25, 2007, the date of the Fairness Hearing, only twelve individual investors and one institutional investor had filed objections to either the settlement or the request for an award of attorneys' fees and reimbursement of expenses.[9]  As discussed below, those objections are either overruled as meritless or have been rendered moot.

*Fairness Hearing*

On July 25, 2007, the Court held the Fairness Hearing. Lead Counsel spoke in favor of the settlement and in support of the application for an award of attorneys' fees of 24%, and reimbursement of litigation expenses.  Counsel for defendants appeared but did not argue in favor of the settlement or the application for attorneys' fees.  Counsel for the sole institutional objector, the New York State Teachers' Retirement System, appeared and stated an objection to the Settlement.  No other objectors attended the hearing.

**DISCUSSION**

***(i) Certification of the Settlement Class***

---

[9]Two individual investors, Susan Lockshine and Gary Bauer, withdrew their joint objection after filing it.  One institutional investor, the Commonwealth of Pennsylvania Public School Employees' Retirement System, also withdrew its objection subsequent to filing.

The Stipulation contemplates certification of the
settlement class.  "Before certification is proper for any
purpose–settlement, litigation, or otherwise–a court must ensure
that the requirements of Rule 23(a) and (b) have been met."
Denny v. Deutsche Bank, A.G., 443 F.3d 253, 270 (2d Cir. 2006).
Rule 23(a) imposes four threshold requirements on putative class
actions:  numerosity, commonality, typicality, and adequacy of
representation.  Id. at 267.  In addition, Rule 23(b)(3) imposes
the following two requirements:  "Common questions must
'predominate over any questions affecting only individual
members'; and class resolution must be 'superior to other
available methods for the fair and efficient adjudication of the
controversy.'"  Id. (quoting Fed. R. Civ. P. 23(b)(3)).  The Court
considers each requirement in turn.

*Numerosity*

Rule 23(a)(1) requires that the putative class be "so
numerous that joinder of all class members is impracticable."
Fed. R. Civ. P. 23(a)(1).  While no minimum number of plaintiffs
is required for a suit to be maintained as a class action,
"[g]enerally, courts will find a class sufficiently numerous when
it comprises 40 or more members." DeMarco v. Nat'l Collector's
Mint, Inc., 229 F.R.D. 73, 80 (S.D.N.Y. 2005) (citation and
internal quotations omitted).  Here, Analytics identified more
than 1.8 million potential Class Members.  At the Fairness

17

Hearing, Lead Counsel informed the Court that, as of the week ending July 20, 2007, more than 80,000 claims had been filed. The settlement classes in these Actions clearly are so large that individual actions by all potential plaintiffs would not be possible.  The numerosity requirement therefore is satisfied.

*Commonality*

Under Rule 23(a)(2), class certification is appropriate where "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  The commonality requirement of Rule 23(a)(2) is satisfied if "all class members are in a substantially identical factual situation and the questions of law raised by the plaintiff[s] are applicable to each class member." In re Playmobil Antitrust Litig., 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998).  The rule does not require that every question of law or fact be common to each class member. Id.  "The commonality requirement has been applied permissively in the context of securities fraud litigation." In re Veeco Instruments, Inc., Sec. Litig., 235 F.R.D. 220, 238 (S.D.N.Y. 2006).  Here, the Actions raise questions of law and fact that are common to each class member.  Plaintiffs are suing under the same federal securities laws, alleging the same misrepresentations and/or omissions of material statements in the Merrill Lynch research reports, and alleging that the misrepresentations artificially inflated the prices of the stocks at issue, thereby resulting in

18

the plaintiffs' financial losses.  Thus, "the success of each
plaintiff's claim turns on establishing the existence, nature and
significance of the same alleged misrepresentations and
omissions." Id.  The commonality requirement is satisfied.

*Typicality*

Rule 23(a)(3) is satisfied if "the claims or defenses
of the representative parties are typical of the claims or
defenses of the class." Fed. R. Civ. P. 23(a)(3).  The
"typicality" requirement is met where "the claims of the named
plaintiffs arise from the same practice or course of conduct that
gives rise to the claims of the proposed class members." Schwab
v. Philip Morris USA, Inc., 449 F. Supp. 2d 992, 1104 (E.D.N.Y.
2006) (internal quotations and citation omitted).  Here, there is
no indication that the claims of the lead plaintiffs differ in
any respect from the claims of the rest of the putative Class
Members.  Thus, the typicality requirement is satisfied.

*Adequacy of Representation*

Rule 23(a)(4) requires that "the representative parties
will fairly and adequately protect the interests of the class."
Fed. R. Civ. P. 23(a)(4).  This necessitates a two-part inquiry:
(1) whether the lead plaintiffs' interests are antagonistic to
the interests of other members of the class, and (2) whether
plaintiffs' attorneys are qualified, experienced and able to

19

conduct the litigation.  <u>Baffa v. Donaldson, Lufkin & Jenrette
Sec. Corp.</u>, 222 F.3d 52, 60 (2d Cir. 2000).  Regarding the first
prong, there is no indication that the lead plaintiffs' claims
conflict in any way with the claims of other Class Members.  As
stated above, the claims of the named plaintiffs appear to be
typical of the claims of the remainder of the class.  The second
prong also is satisfied.  As the resumes submitted by Lead
Counsel clearly show, counsel have wide experience in the field
of securities class litigation.  Further, as discussed below and
as is clear from the record of this litigation, counsels'
skillful and zealous representation over a six-year period
enabled the settling classes to obtain a favorable and certain
cash recovery.  Thus, the final requirement of Rule 23(a) has
been met.

*Rule 23(b)(3):  Predomination and Superiority*

Rule 23(b)(3) requires "[1] that common questions of
law or fact predominate over individual questions and [2] that a
class action is superior to other methods of adjudication." <u>In re
Veeco Instruments, Inc.</u>, 235 F.R.D. at 240.  "In determining
whether common questions of fact predominate, a court's inquiry
is directed primarily toward whether the issue of liability is
common to members of the class." <u>In re Blech Sec. Litig.</u>, 187
F.R.D. 97, 107 (S.D.N.Y. 1999).  Common questions also
predominate where "even if each Class member were to bring an

individual action, each would be required to prove the existence
of the alleged activities of the defendants in order to prove
liability." Id.  Here, only the issue of damages will be
different for each Class Member in each Action, depending upon
the number of shares owned by a given Class Member and the dates
on which those shares were purchased, sold, and/or held.
Further, as discussed above, the Class Members' claims involve
the same questions of fact and law.  Thus, even if each Class
Member in each Action were to bring suit individually, each
plaintiff would have to allege and prove virtually identical
facts.  Therefore, common questions predominate.

        Rule 23(b)(3) sets forth the following factors to
be considered in making a determination of superiority:
"(A) The interest of members of the class in individually
controlling the prosecution . . . of separate actions; (B)
The extent and nature of any litigation concerning the
controversy already commenced by . . . members of the class;
(C) The desirability . . . of concentrating the litigation
of the claims in the particular forum; and (D) The
difficulties likely to be encountered in the management of a
class action." Fed. R. Civ. P. 23(b)(3).  As the court
observed in In re Blech Sec. Litig.,

>     In general, securities suits . . . easily satisfy the
>     superiority requirement of Rule 23.  Most violations of
>     the federal securities laws . . . inflict economic injury
>     on large numbers of geographically dispersed persons such

> that the cost of pursuing individual litigation to seek
> recovery is often not feasible.  Multiple lawsuits would
> be costly and inefficient, and the exclusion of class
> members who cannot afford separate representation would
> neither be 'fair' nor an adjudication of their claims.
> Moreover, although a large number of individuals may have
> been injured, no one person may have been damaged to a
> degree which would induce him to institute litigation
> solely on his own behalf.

187 F.R.D. at 107.

The reasoning of the court in <u>Blech</u> applies in these Actions, where there are potentially hundreds of thousands of Class Members and the expected recovery per share is low.  Because of the large number of potential claimants and the relatively small damage suffered by potential individual claimants, it is unlikely that individual plaintiffs would endure the expense of litigation in order to bring their claims.  There is no indication that counsel are likely to encounter any difficulties in administering the settlement of the actions.  Therefore, because class action treatment is superior to any other method for the fair and efficient adjudication of these Actions, the requirements of Rule 23(b)(3) are satisfied.

Because the factors for class certification set forth in Rule 23(a) and Rule 23(b)(3) have been met, the application to certify the classes for settlement is granted.

*(ii) Approval of Final Settlement*

22

          Federal Rule 23(e) governs the settlement of class actions and requires court approval before a settlement is executed.  Adequate notice of the proposed settlement must be provided and the proposed settlement must be the subject of a fairness hearing. Fed. R. Civ. P. 23(e)(1).  In addition, a court may approve a settlement that is binding on the class only if it determines that the settlement is "fair, adequate, and reasonable" and not a "product of collusion." <u>Joel A. v. Giuliani</u>, 218 F.3d 132, 138 (2d Cir. 2000).  This evaluation requires the court to consider both "the settlement's terms and the negotiating process leading to settlement." <u>Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.</u>, 396 F.3d 96, 116 (2d Cir. 2005).  The determination of the fairness of a settlement is a matter addressed to the Court's discretion. <u>Joel A.</u>, 218 F.3d at 139.

### *Adequacy of Notice*

          While there are no rigid rules to determine the adequacy of notice in a class action, the standard is generally that of reasonableness.  <u>Wal-Mart</u>, 396 F.3d at 113-14.  Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members. <u>Weigner v. City of</u>

New York, 852 F.2d 646, 649 (2d Cir. 1988).  Notice is
generally deemed reasonable if the average person
understands the terms of the proposed settlement and the
options provided to class members thereunder.  Wal-Mart, 396
F.3d at 114.

  In these Actions, counsel provided potential Class
Members with adequate notice of the Settlement.  Counsel,
through a Court-approved claims administrator, disseminated
the Notice to more than 1.8 million potential claimants.  In
plain language that is easily understood by the average
person, the Notice set forth essential information,
including the background of the Actions, the terms of the
Settlement, the Plan of Allocation, and the various rights
of Class Members under the Settlement (including the right
to opt out, file objections, and attend the Fairness
Hearing).  Appended to each Notice was a form for Proof of
Claim, which contained detailed instructions for filing
claims under the Settlement, including a "Reminder
Checklist" that summarized the steps that a Class Member
needed to take in order to submit a claim.  Counsel also
complied with the publication requirement, causing the
Summary Notice to be published in appropriate national print
and online publications.  The Summary Notice contained the
required information regarding the Settlement terms and

process and provided clear instructions on how potential claimants could obtain a copy of the Notice and Proof of Claim.  The Court finds that Notice of the proposed settlement of the Actions was reasonable.

*Procedural Fairness*

"A 'presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" Wal-Mart, 396 F.3d at 116 (quoting Manual for Complex Litigation, Third, § 30.42 (1995)).  "'The experience of counsel, the vigor with which the case was prosecuted, and the coercion or collusion that may have marred the negotiations themselves' shed light on the fairness of the negotiating process." Hicks v. Morgan Stanley & Co., No. 01 Civ. 10071,  2005 U.S. Dist. LEXIS 24890, at *13 (S.D.N.Y. Oct. 24, 2005) (quoting Malchman v. Davis, 706 F.2d 426, 433 (2d Cir. 1983)).

It is clear from the record of this case that the negotiations leading to the Settlement were procedurally fair.  The parties first discussed the potential for settlement in October 2003 and continued negotiations in 2004 and 2005, pausing only to re-evaluate their positions after the Second Circuit issued its crucial ruling in Lentell in 2005.  After agreeing on key settlement terms in

February 2006, the parties spent nearly one year conducting further negotiations before executing the Stipulation, in January 2007.  In sum, counsel with wide experience and demonstrated skill in the field of class action securities litigation represented both sides in reaching the Stipulation after protracted negotiations.  There is nothing in the record of this litigation to rebut the presumption of procedural fairness that attaches to the negotiation process.  The Court thus finds that the process by which the parties negotiated the proposed settlement was fair and reasonable.

*Substantive Fairness*

Courts of the Second Circuit examine the well-established "Grinnell factors" to determine whether a settlement is substantively fair and reasonable as required by Rule 23(e).  The factors that a district court considers are:

> (1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]

D'Amato v. Deutsche Bank, 236 F.3d 78, 86 (2d Cir. 2001)

(citing City of Detroit v. Grinnell Corp., 495 F.2d 448,

463, abrogated on other grounds by Goldberger v. Integrated

Reserves, Inc., 209 F.3d 43 (2d Cir. 2000)).  A court need

not find that every factor militates in favor of a finding

of fairness; rather, a court "consider[s] the totality of

these factors in light of the particular circumstances." In

re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 456

(S.D.N.Y. 2004).

        Application of the Grinnell factors in these

Actions leads ineluctably to the same conclusion that this

Court reached in the MF Decision:  namely, that given the

dire procedural posture of this case, "[t]here is little

question that the settlement agreements . . . are fair and

adequate to the class because they would provide what

further litigation could not—any recovery for class

members." In re Stock Exchs. Options Trading Antitrust

Litig., No. 99 Civ. 0962, 2006 U.S. Dist. LEXIS 87825, at

*26 (S.D.N.Y. Dec. 4, 2006) (internal quotations and

citation omitted)).  The proposed settlement in this case

provides Class Members with the immediate and certain

benefit of a substantial cash settlement.  Had the

plaintiffs not settled and pursued the litigation of these

Actions, the almost certain result would have been complete

non-recovery.  As discussed above, the Second Circuit, in
Lentell, affirmed Judge Pollack's dismissal-with-prejudice
of the complaints in the Test Cases on loss causation
grounds.  Similarly, Judge Pollack dismissed with prejudice
the complaints in the Phase I cases on the ground, inter
alia, that the plaintiffs had failed adequately to plead
loss causation.  Given the Circuit's ruling in Lentell, the
dismissals of the Phase I cases were highly likely to be
upheld by the Second Circuit on appeal.  The Phase II cases
probably would have suffered the same fate:  that is,
dismissal with prejudice in this Court on the ground, inter
alia, of failure to plead loss causation, followed by
affirmance of the dismissal in the Second Circuit.
Similarly, the HOLDRs cases, when subjected to motions to
dismiss, were also highly likely to have suffered
dismissals-with-prejudice and affirmance of those dismissals
on appeal.  In light of the high likelihood of non-recovery
faced by the plaintiffs at the time the Stipulation was
executed, the Settlement represents a fair recovery for the
plaintiffs.

The size of the Settlement Fund, in light of the
risk faced by the plaintiffs were they to proceed with these
Actions, militates in favor of approval.  Here, the
Settlement Fund will amount to over $133 million.  The

28

alternative, as noted above, is an extremely high risk, if
not a certainty, of complete non-recovery.  According to the
plaintiffs' damages experts (Financial Market Analysis LLC
("FMA")), the total claimed damages in these actions were
estimated at a high of $4,134,800,000, and a low of
$1,735,800,000.  Thus, the Settlement Fund represents
between approximately 3% and 7% of the claimed damages.  A
recovery of between approximately 3% and 7% of estimated
damages is within the range of reasonableness for recovery
in the settlement of large securities class actions.  See
Hicks, 2005 U.S. Dist. LEXIS 24890, at *19 (finding a
settlement representing 3.8% of plaintiffs' estimated
damages to be within range of reasonableness); see also
Ellen M. Ryan & Laura E. Simmons, Cornerstone Research,
Securities Class Action Settlements:  2006 Review and
Analysis, at 6, available at
http://securities.cornerstone.com/pdfs/settlements_2006.pdf
(last visited August 23, 2007) (reporting that, in 2006, the
median settlement as a percentage of estimated damages was
0.7% in securities class actions where estimated damages
ranged between $1.001 and $5 billion).  Thus, the
substantial recovery of $125 million, plus accrued interest,
weighs in favor of approval.

The overwhelmingly positive reaction of the class also weighs heavily in favor of approval of the Settlement. After over 1.8 million Notices were mailed to potential Class Members, only eleven objections to the fairness of the Settlement were submitted, and only 299 investors requested to be excluded from the Settlement.  "If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart, 396 F.3d at 118.  Here, the relatively small number of objections and requests for exclusion militate in favor of approving the settlement as be fair, adequate, and reasonable. See, e.g., D'Amato, 236 F.3d at 86 (approving settlement where 18 objections were filed after notice was sent to 27,883 class members); McBean v. City of New York, 233 F.R.D. 377, 386 (S.D.N.Y. 2006) (approving settlement where, after notice was sent to 40,352 class members, only four objected and 36 opted out of settlement); Hicks, 2005 U.S. Dist. LEXIS 24890, at *16 (finding that reaction of class supported approval, where 123 class members out of approximately 100,000 requested exclusion and only three filed objections).

In sum, after considering the relevant Grinnell factors, the Court finds that the Settlement is substantively fair and reasonable.

_Objections to Settlement_

The eleven objections to the fairness of the proposed Settlement have been rendered moot or are without merit and do not weigh against approval of the Settlement. All of the objections to the fairness of the Settlement were filed by individuals, none of whom attended the Fairness Hearing.  Although several of the objections were improperly filed (for example, served on counsel but not filed with the Court, filed with the Court but not served on counsel, or filed untimely), the Court will ignore any procedural defects and address each on its merits.

_Manning Warren_:  Mr. Warren simply objects to the Settlement on the ground that the amount of the Settlement Fund is less than the fines paid by Merrill Lynch to settle the NYAG's action.  This is factually incorrect:  Merrill Lynch paid $100 million in settlement, <u>see</u> NYAG Press Release, <u>Spitzer, Merrill Lynch Reach Unprecedented Agreement to Reform Investment Practices: Merrill Lynch to Pay $100 Million Penalty</u>, May 21, 2002, available at http://www.oag.state.ny.us/press/2002/may/may21a_02.html (last visited August 23, 2007).  The Settlement Fund, without interest, amounted to $125 million.  Mr. Warren further states that the settlement is "unreasonably low and is not in the investors class' best interests." (Objection

of Manning Warren.) These conclusory statements are not
sufficient to weigh against approval of the Settlement as
fair and reasonable.

*David Race*:  Mr. Race objects on the ground that
the settlement classes should include acquirers of shares in
the stock, Openwave, through a merger.  As plaintiffs point
out, Mr. Race is simply mistaken.  Even though Mr. Race
acquired his shares through a merger, he is nevertheless
deemed a member of the class under the provisions of the
Settlement.  Lead Counsel have represented to the Court and
have informed Mr. Race and his attorney that Mr. Race will
be included in the Settlement.  Accordingly, I consider Mr.
Race's objection to be dismissed as moot.

*Frank Cordingley*:  Mr. Cordingley states that a
recovery equivalent to "10% return on initial investment
would be considered good faith for believing that no
criminal activities would occur during this American
institution called our stock exchange . . . ." (Objection of
Frank Cordingley.)  Mr. Cordingley does not otherwise
explain why the terms of settlement are unfair.  Mr.
Cordingley's statement does not constitute a valid ground
for objection.

*Frank Arcuri*:  Mr. Arcuri objects to the Plan of
Allocation for shareholders of CMGI stock.  Mr. Arcuri

states that his losses in the stock exceeded $20,000 and
that the one cent/share recovery provided for shareholders
of CMGI during the relevant class period by the Plan of
Allocation is "without merit, and frivolous, and should be
dismissed." (Objection of Frank Arcuri.)  Mr. Arcuri
proposes that a larger recovery for each CMGI shareholder
can be obtained by proportionately reducing attorneys' fees.
Plaintiffs assert that the recovery for CMGI shareholders is
appropriately low because it "reflects the weakness of
plaintiffs' allegations" during the relevant class period.
As counsel note, Judge Phillips classified the CMGI case as
a "low-tier liability/zero damage case." (Pl. Mem. in
Support of Settlement at 25.)

        As discussed below, Judge Phillips' analysis of
the relative strength of each Action and the resulting Plan
of Allocation were reasonable and fair.  Mr. Arcuri has not
shown why Judge Phillips' assessment of the weakness of the
CMGI Action, during the relevant class period, is erroneous,
in light of the fact that claimants in Mr. Arcuri's position
simply would be unable to prove loss causation.  Thus, Mr.
Arcuri's objection does not weigh against approval of the
Settlement.

        *Cliff Bamford*:  Mr. Bamford simply requests that
the Court exclude him from the settlement, mainly on the

ground that the proposed settlement enriches class counsel while providing little justice or relief to injured investors such as himself.  As plaintiffs point out, Mr. Bamford's application does not comply with the requirements set forth in the Notice, namely because Mr. Bamford has failed to state the type and number of shares he owned of a particular security that is the subject of these Actions, nor when he bought or sold the security.  To the extent that Mr. Bamford's submission is deemed an objection, it has no merit.

*Ernest Michaud*:  Mr. Michaud reports that, as a result of his purchase of Exodus stock, he ended up losing "12 to 15 thousand dollars.  Money I had earmarked to help pay for my children's college expenses." (Objection of Ernest Michaud.)  He describes the proposed settlement, from which he stands to recover only five dollars, as a "joke" and regrets that the notice has reminded him of "this bad memory" that he had almost succeeded in forgetting. (Id.) Although Mr. Michaud clearly has expressed his displeasure with the outcome of his investment and this Settlement, his objection does not state any valid reason why the Court should not approve the settlement.

*Bryan Fitzpatrick*:  Mr. Fitzpatrick states that he bought and sold 200 shares of CGMI and 100 shares of ICGE

34

during the relevant class periods.  Mr. Fitzpatrick
primarily objects that he stands to recover nothing because
he did not sell his securities at a net loss.  He cites to
Dura Pharmeceuticals v. Broudo, 544 U.S. 336 (2005), for the
proposition that a shareholder may recover on a claim for
securities fraud when a shareholder, despite having incurred
no out-of-pocket loss, nevertheless realizes a gain that was
less than it would have been but for the fraud.  Mr.
Fitzpatrick protests that it is unfair to extinguish the
claims of shareholders who did not incur net losses; he
states that the proper course would have been to "exclude
such persons from the definition of the class and permit
them to pursue their claims in another action if they so
choose." (Objection of Fitzpatrick.)  He also states that
the Settlement, which treats shareholders of CMGI and ICGE
stock differently depending upon when the shares were bought
and sold, constitutes a conflict of interest that is
violative of constitutional due process.

        As plaintiffs note, it is well-settled in the
Second Circuit that it is not inequitable for a plan of
allocation to provide for distribution of the proceeds of a
settlement fund only to claimants who suffered out-of-pocket
losses as a result of the defendants' alleged fraudulent
conduct. See Official Comm. Of Unsecured Creditors of

WorldCom, Inc. V. SEC, 467 F.3d 73 (2d Cir. 2006).  Thus,
the Settlement does not violate Mr. Fitzpatrick's right to
due process of law.  As plaintiffs further note, had Mr.
Fitzpatrick wished to preserve his claims and commence his
own action against the defendants, he could have opted out
of the Settlement.  The Court finds that Mr. Fitzpatrick's
objections to the fairness of the Settlement have no merit.

*Bonita Bates*:  Ms. Bates purchased and sold ICGE
shares prior to November 8, 2000, the date on which
previously undisclosed risks relating to ICGE were revealed.
Ms. Bates objects to the Plan of Allocation's failure to
distribute settlement proceeds to investors who purchased
and sold ICGE stock prior to November 8, 2000.  As
plaintiffs note, shareholders who sold their ICGE stock
prior to the disclosure of previously undisclosed risks
would be unable to prove loss causation.  Therefore, the
Plan of Allocation reasonably provides no recovery for
claimants who, like Ms. Bates, sold their ICGE stock prior
to the date of disclosure.  Accordingly, Ms. Bates'
objection has no merit.

*Thomas & Catherine Quaranta*:  The Quarantas appear
to object to the fact that the class period during which
they purchased and sold shares of CMGI stock allows them to
obtain no recovery under the Plan of Allocation.  The

36

objection has no merit, however, because the Quarantas sold their shares of CMGI before Merrill Lynch disclosed the existence of previously undisclosed risks.   Thus, like Ms. Bates, the Quarantas are unable to prove loss causation, and accordingly, it is fair and reasonable that the Plan of Allocation recognizes no loss for the period at issue and provides the Quarantas with no recovery.

*Susan Borstein*:  Like the Quarantas, Ms. Borstein purchased and sold her CMGI shares prior to the defendants' revelation of previously undisclosed risks; thus, she would be unable to prove loss causation, her recognized loss is zero, and her objection to the Settlement has no merit.

*Slayden Yarbrough*:  Mr. Yarbrough also objects to the absence of recognized loss, under the Plan of Allocation, for his purchase of CMGI shares.  Mr. Yarbrough purchased his CMGI shares after the defendants revealed previously concealed negative facts regarding CMGI.  Thus, Mr. Yarbrough would be unable to prove loss causation and his recognized loss is, appropriately, zero.

In sum, the eleven individual investors' objections to the fairness of the Settlement do not weigh against approval of the Settlement as fair and reasonable.

*Plan of Allocation*

_____ "In approving an allocation plan, the Court must ensure that the distribution of funds is fair and reasonable." Hicks, 2005 U.S. Dist. LEXIS 24890, at *19-20 (citations omitted).  A plan of allocation that is devised by competent and experienced class counsel "need have only a reasonable, rational basis." Id. (internal quotations and citation omitted).

The Plan of Allocation was developed by Lead Counsel with the significant participation of a retained neutral arbiter, former United States District Court Judge Phillips.  As noted above, the Plan of Allocation is the result of extensive proceedings conducted before the former Judge Phillips and his subsequent assessment of counsels' arguments and the relative factual strengths and weaknesses of each Action.  The Plan of Allocation calls for the Settlement Fund to be distributed to Class Members in each Action on the basis of each Class Member's pro rata loss of value in shares for each Action during relevant class periods for which there existed a recognized loss.  A plan of allocation that calls for the pro rata distribution of settlement proceeds on the basis of investment loss is reasonable. See In re Merrill Lynch & Co. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *39-40; Hicks, 2005 U.S. Dist. LEXIS 24890, at *21 (citing In re Global

38

Crossing, 225 F.R.D. at 462).   Further, the Court notes that
the Plan of Allocation was described in detail in the Notice
that was sent to each potential class member, and as
discussed above, the few objections to the Plan have no
merit.   Accordingly, the Court approves the Plan of
Allocation as fair and reasonable.

### (iii) Attorneys' Fees

          Lead Counsel request an award of attorneys' fees
in the amount of 24% of the Settlement Fund, or
approximately $31,994,609, as of June 15, 2007.   The
requested award translates to a multiple of 1.985 of
counsels' total lodestar and an hourly rate of $912.80 for
all the legal and paraprofessional work expended on these
Actions.   Lead Counsels' request comports with the terms of
the Notice provided to potential class members, which stated
that counsel would not request fees in excess of 30% of the
Settlement Fund.

          "[W]here an attorney succeeds in creating a common
fund from which members of a class are compensated for a
common injury inflicted on the class . . . the attorneys
whose efforts created the fund are entitled to a reasonable
fee-set by the court-to be taken from the fund." Goldberger,
209 F.3d at 47.   A district court has broad discretion to
award attorneys' fees, and an award of fees will be

39

overturned only for abuse of that discretion. Id.  In the
Second Circuit, a district court may calculate attorneys'
fees in one of two ways.  Under the "lodestar" method, "an
attorney fee award is derived by multiplying the number of
hours reasonably expended on the litigation by a reasonable
hourly rate." A.R. v. N.Y. City Dep't of Educ., 407 F.3d 65,
79 (2d Cir. 2005)(internal quotations and citations
omitted).  The court then may apply a multiplier to the
lodestar figure to account for other factors, such as the
risk of the litigation, the performance of counsel, or the
success achieved. See In re Twinlab corp. Sec. Litig., 187
F. Supp. 2d 80, 84-85 (E.D.N.Y. 2003).  The percentage of
the fund method is a simpler calculation where the award is
based on "some percentage of the fund created for the
benefit of the class." Savoie v. Merchants Bank, 166 F.3d
456, 460 (2d Cir. 1999) (citing Blum v. Stenson, 465 U.S.
886, 900 n.16 (1984)).

     Both the lodestar and percentage methods are
permissible methods of calculating reasonable attorneys'
fees. Goldberger, 209 F.3d at 50.  The trend in the Second
Circuit, however, has been to express attorneys' fees as a
percentage of the total settlement, rather than to use the
lodestar method to arrive at a reasonable fee. Wal-Mart, 396
at 121; In re Elan Sec. Litig., 385 F. Supp. 2d 363, 373

(S.D.N.Y. 2005).   The Second Circuit disfavors application
of the lodestar method because the "lodestar create[s] an
unanticipated disincentive to early settlements, tempt[s]
lawyers to run up their hours, and compel[s] district courts
to engage in a gimlet-eyed review of line-item fee audits."
Wal-Mart, 396 F.3d at 122 (internal quotations and citation
omitted); see also In re AOL Time Warner, Inc. Sec. &
"ERISA" Litig., No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS
78101, at *24 (S.D.N.Y. Sept. 28, 2006), report and
recommendation adopted by 2006 U.S. Dist. LEXIS 77926
(S.D.N.Y. Oct. 25, 2006) (noting that "every significant
Southern District opinion facing the issue since Goldberger
has embraced the percentage approach").   The percentage
method usually is deemed to be preferable "because it
reduces the incentive for counsel to drag the case out to
increase the number of hours billed; also, fewer judicial
resources will be spent in evaluating the fairness of the
fee petition." Hicks, 2005 U.S. Dist. LEXIS 24890, at *23
(citation omitted).   Use of the percentage method also
comports with the statutory language of the Private
Securities Litigation Reform Act of 1995 ("PSLRA") which
specifies that "total attorneys' fees and expenses awarded
by the court to counsel for the plaintiff class shall not
exceed a reasonable percentage of the amount of any damages

41

and prejudgment interest actually paid to the class . . . ."
15 U.S.C. § 78u-4(a)(6) (emphasis added); <u>Maley v. Del
Global Tech.</u>, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002)
(noting that in amending the PSLRA, Congress "indicated a
preference for the use of the percentage method").

Whether the fee is calculated using the lodestar
or percentage method, courts consider the following
<u>Goldberger</u> factors in determining a reasonable award of
fees:  "(1) the time and labor expended by counsel; (2) the
magnitude and complexities of the litigation; (3) the risk
of litigation . . .; (4) the quality of representation; (5)
the requested fee in relation to the settlement; and (6)
public policy." <u>Goldberger</u>, 209 F.3d at 50.  "Even when the
percentage method is used, however, the Second Circuit
'encourages the practice of requiring documentation of hours
as a 'cross-check' on the reasonableness of the requested
percentage.'" <u>In re Visa Check/Mastermoney Antitrust Litig.</u>,
297 F. Supp. 2d 503, 520-21 (E.D.N.Y. 2003), aff'd <u>Wal-Mart</u>,
396 F.3d at 96 (2d Cir. 2005) (quoting <u>Goldberger</u>, 209 F.3d
at 50).  In evaluating the lodestar value for "cross-check"
purposes, the hours submitted by the attorneys are reviewed
but not exhaustively scrutinized. <u>Goldberger</u>, 209 F.3d at
50.  In determining a reasonable award of attorneys' fees,
the Court seeks to balance the "overarching concern for

moderation with the concern for avoiding disincentives to
early settlements." In re Elan Sec. Litig., 385 F. Supp. 2d
at 376 (citations and internal quotations omitted).  A fee
award  "should be assessed based on scrutiny of the unique
circumstances of each case, and 'a jealous regard to the
rights of those who are interested in the fund.'"
Goldberger, 209 F.3d at 53 (quoting Grinnell, 495 F.2d at
469).

        Counsel argue that an award of 24% in these
Actions is fair and reasonable in light of this Court's
award of a fee of 22.5% in the Mutual Fund Cases.  Counsel
contend that the Mutual Fund Cases, which were part of the
same MDL as the instant Actions and were based on similar
allegations of wrongful conduct engaged in by largely the
same defendants, provide a useful benchmark for the Court's
analysis of the Goldberger factors.  Counsel also assert
that an award of 24%, which marks a slight, 1.5% increase
over the award granted in the Mutual Fund Cases, is
justified in light of the differences between this
litigation and the Mutual Fund Cases.  Specifically, counsel
point to the greater risk of non-recovery encountered by the
plaintiffs at the outset of this litigation and the more
difficult discovery undertaken in this case as justifying

the award of a larger percentage than that awarded in the MF
Decision.

The Court agrees that the MF Decision, and the
award of fees in that litigation, provide a useful benchmark
in determining an appropriate award of attorneys' fees in
the instant case.  Thus, in analyzing the relevant factors,
the Court will remain mindful of its application of those
factors in the MF Decision.  Here, as in MF Decision, the
Court will determine attorneys' fees using the percentage
method.  Each of the Goldberger factors will be considered,
and the Court then will evaluate the lodestar figure as a
"cross-check" on the reasonableness of the percentage
requested.

*(1) Time and Labor Expended*

Plaintiffs' counsel expended a total of 35,051.26
hours of legal and paraprofessional work over the course of
approximately six years on this litigation.[10]  By contrast,
counsel in the Mutual Fund Cases expended a total of 9,462
hours, over four years of litigation.  Lead Counsel argue
that the work expended in this case was more far more

---

[10]Originally, counsel claimed to have expended 36,847.26
hours.  Lead Counsel subsequently submitted a letter, and
accompanying corrected declarations and memoranda, in which they
candidly stated that, due to a clerical error, one of the
attorneys in the case had misstated his billable time as 1800
hours, when he actually expended only four hours.

extensive than that expended in the Mutual Fund Cases,
because of "both the number of actions that were prosecuted
and the additional proceedings handled by counsel . . . ."
(Pl. Mem. Attny Fees at 9.)  Counsel state that the work
included:  preparation of pleadings for each separate action
and the subsequent filing of consolidated amended
complaints; filing opposition briefs to defendants' motions
to dismiss in sixteen of the twenty actions; extensive and
successful efforts in the face of considerable initial
resistance by the NYAG to obtain documents possessed by the
NYAG; review of the NYAG documents; filing a motion for
reconsideration after Judge Pollack dismissed the Test
Cases; preparing and filing briefs in appeal of Judge
Pollack's dismissals of both the Test Cases and Phase I
cases; preparing and filing a motion for reconsideration of
the Second Circuit's affirmance of Judge Pollack's dismissal
of the Test Cases; preparing and filing a writ of certiorari
to the Supreme Court after the Second Circuit's affirmance
of the dismissal of the Test Cases; conducting extensive
settlement negotiations both before and after the Circuit's
decision in Lentell; drafting the Stipulation and
Preliminary Order; and participating in the allocation
proceedings before Judge Phillips, which included

preparation of "allocation briefs" for each security and oral argument following submission of the briefs.

The number of hours expended in the litigation of these actions is justified.   Collectively, these Actions constitute a more massive litigation than did the Mutual Fund Cases.   In contrast to the work performed in the Mutual Fund Cases, the labor in this case involved the preparation of more pleadings, more extensive motion practice, more arduous discovery, lengthier settlement negotiations, and more work in devising a fair and reasonable Plan of Allocation.   In sum, the work performed in these Actions supports counsels' request for an award that is higher than that granted in the MF Decision.

*(2) Magnitude and Complexity*

Securities class litigation "'is notably difficult and notoriously uncertain.'" <u>In re Sumitomo Copper Litig.</u>, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) (quoting <u>In re Michael Milken and Assoc. Sec. Litig.</u>, 150 F.R.D. 46, 53 (S.D.N.Y. 1993)).   Counsel contend that these Actions presented greater complexity than that of the Mutual Fund Cases.   In the MF Decision, I noted that the litigation did not involve particularly challenging issues, such as difficulties in obtaining discovery, and was not of unusual magnitude .   Here, by contrast, counsel contend that they "undertook

expansive and difficult efforts to obtain" the NYAG
documents. (Joint Decl. ¶ 21.)  Specifically, in October
2002, counsel submitted a request under New York's Freedom
of Information Law to obtain the NYAG documents.  The
request was denied, as was plaintiffs' appeal from the
denial.  Subsequently, counsel negotiated directly with the
NYAG and initially received permission to review, but not
copy, the documents at the NYAG's offices.  It was only
later that the NYAG documents became public, and therefore
fully available to counsel in the Mutual Fund Cases.  Thus,
counsel assert  that the "review of the critical documents
in those [the Mutual Fund] cases (and these Actions) would
not have been possible but for the extraordinary efforts of
plaintiffs' counsel here." (Pl. Mem. Attny Fees at 11.).

Lead Counsel also state that the magnitude of
these actions is much greater than that of the Mutual Fund
Cases, primarily because this case involved the litigation
of twenty separate actions, each involving divergent facts.
Counsel point to the fact that the merits of each complaint
had to be litigated separately, for plaintiffs' oppositions
to the motions to dismiss and for plaintiffs' separate
briefs before former Judge Phillips in support of an award
of allocation for each action.  Counsel point to the
intricate process which underlay the formulation of the Plan

47

of Allocation as evidence of the overall complexity of the case.

The Court agrees here that "this Case is complex with difficult liability issues." Levitt v. Bear Stearns & Co. (In re Sterling Foster & Co. Sec. Litig.), MDL No. 1208, 2006 U.S. Dist. LEXIS 80861, at *25 (E.D.N.Y. Oct. 31, 2006). Although the issues involved in the litigation of these Actions were not particularly novel or complex when compared with some other securities class actions, see In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d 229, 234 (S.D.N.Y. 2005) (evaluating the complexity of the class action relative to other securities actions), the magnitude and complexity of these Actions are certainly greater than were present in the Mutual Fund Cases. The greater number of Actions, each implicating different material facts, and the more arduous discovery undertaken in the course of this litigation militate in favor of an award higher than that granted in the Mutual Fund Cases. Accordingly, I find that this factor supports the requested award of 24%.

*(3) Risk of Litigation*

Courts of the Second Circuit have recognized the risk of litigation to be "perhaps the foremost factor to be considered in determining" the award of appropriate attorneys' fees. In re Elan Sec. Litig., 385 F. Supp. 2d

363, 374 (S.D.N.Y. 2005) (internal quotations and citation
omitted).  There is generally only a very small risk of non-
recovery in a securities class action. See Dreyfus
Aggressive Growth Mutual Fund Litigation, No. 98 CV4318,
2001 U.S. Dist. LEXIS 8418, 2001 WL 709262, at *4 (S.D.N.Y.
June 22, 2001) ("What empirical data does exist indicates
that all but a small percentage of class actions settle,
thereby guaranteeing counsel payment of fees and minimizing
the risks associated with contingency fee litigation.")
(citing S. Rep. No. 104-98, at 9 (1995) (estimating that
about 300 securities lawsuits are filed each year and that
93% of these cases reach settlements).  In the MF Decision,
I  noted that "'where claims were precipitated by public
events,' the risk undertaken by class counsel is especially
slight." In re Merrill Lynch & Co. Research Reports Sec.
Litig., 2007 U.S. Dist. LEXIS 9450, at *54 (quoting In re
Bristol-Myers Squibb Sec. Litig., 361 F. Supp. 2d at 234).
I found that the risk of non-recovery faced by the
plaintiffs in the Mutual Fund Cases was minimal, given the
NYAG's highly publicized investigation into Merrill Lynch's
misconduct and the resulting settlement between Merrill
Lynch and the NYAG, even though plaintiffs in the Mutual
Fund Cases were faced with the daunting prospect of proving
loss causation.

Here, counsel contend that the risk of litigation was significantly higher than that faced in the Mutual Fund Cases because the InfoSpace Action, which was the first action to be brought in these consolidated cases, was filed in July 2001, approximately eight months before the NYAG's investigation became public.  "[L]itigation risk must be measured as of when the cases is filed." Goldberger, 209 F.3d at 55.  At the time the InfoSpace Action was filed, plaintiffs did not have the benefit of the NYAG's work "and there was no reason to believe a settlement was likely.  On the contrary, the InfoSpace Action was a virtually unprecedented attempt to hold an analyst responsible for issuing conflicted reports." (Pl. Mem. Attny Fees at 13.)

The Court agrees that the risk of litigation faced by plaintiffs in the InfoSpace Action at the time that case commenced was significantly higher than the risk faced in the Mutual Fund Cases and the other nineteen Actions that are the subject of the instant settlement.  Although the InfoSpace Action is only one of twenty actions at issue, the Plan of Allocation calls for 20.4% of the Settlement Fund to be distributed to the InfoSpace plaintiffs.  This is the largest distribution of the settlement proceeds among the Actions, and as a sheerly mathematical matter the allocation indeed renders the InfoSpace action the "most valuable".

(Pl. Mem. Attny Fees at 14.)  Given the relative importance
of the InfoSpace Action, and the clearly heightened risk
faced by the plaintiffs in that case, there was a greater
overall risk faced in these Actions than was faced at the
outset of the Mutual Fund Cases.  Thus, this factor supports
a fee that is greater than the fee awarded in the Mutual
Fund Cases.

*(4) Quality of Representation*

        To evaluate the "quality of the representation,"
courts review the recovery obtained and the backgrounds of
the lawyers involved in the lawsuit. <u>See</u> <u>In re Global</u>
<u>Crossing Sec. & ERISA Litig.</u>, 225 F.R.D. at 467.  "The
quality of opposing counsel is also important in evaluating
the quality of Class Counsels' work." <u>In re KeySpan Corp.</u>
<u>Sec. Litig.</u>, 2005 U.S. Dist. LEXIS 29068, at *35 (citing
<u>Warner Communications Sec. Litig.</u>, 618 F. Supp. 735, 749
(S.D.N.Y. 1985)).

        Here, as noted above, counsel obtained a
reasonable recovery for the Class Members of between
approximately 3% and 7% of total claimed damages.  Given the
moribund procedural posture of these actions and the
likelihood of complete non-recovery in the event that the
litigation continued, the settlement obtained constitutes a
favorable result for the Class Members.

Counsel assert that they have great experience in class securities litigation.  The high quality of representation provided by Lead Counsel is evident from the extensive record of this case, as well as from firm resumes that counsel have submitted to the Court.  Similarly, the defendants were represented by law firms of national repute, and defense counsel provided skilled and zealous representation.  Accordingly, the Court finds that the quality of representation does not weigh against an award of the fee requested by Lead Counsel.

*(5) Requested Fee in Relation to Settlement*

Although a number of cases could be cited to support or oppose the argument that a 24% fee in a securities class action of this size is reasonable, "reference to awards in other cases is of limited usefulness." In re KeySpan Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 29068, at *40 (citing Goldberger, 209 F.3d at 53).  This is because "fee awards should be assessed based on the unique circumstances of each case."  In re Bristol-Myers Squibb Secs. Litig., 361 F. Supp. 2d at 236 (citing Goldberger, 209 F.3d at 52).  Nevertheless, this Court's award of fees of 22.5% of the Settlement Fund in the Mutual Fund Cases, which are very closely related to the instant Actions, provides a highly useful benchmark from which to

assess the reasonableness of Lead Counsel's request of a 24%
fee in these Actions.

The award of 22.5% in the Mutual Fund Cases was
based on a painstaking application of the Goldberger factors
to the facts of those cases.  The reasonableness of an award
of 24% in these Actions, constituting a modest increase of
1.5% of the award granted in the Mutual Fund Cases, is born
out by two crucial differences between the litigations.
First, the discovery undertaken in these Actions was
somewhat more difficult:  plaintiffs in these actions
encountered significant resistance to their efforts to
obtain and review the necessary documents.  Second, the
overall risk encountered by the plaintiffs in these Actions
was greater.  As noted above, the InfoSpace Action
represents a significant portion of the recovery in this
settlement and was commenced eight months before the NYAG's
investigation into the defendants' allegedly misconduct
became public knowledge, well before the onslaught of
nationwide litigation that followed.  Thus, in terms of the
plaintiffs' expectations of recovery, the InfoSpace Action
is readily distinguishable from the Mutual Fund Cases, which
were commenced "with the expectation of a promising
resolution, given the publicity generated by the NYAG's
investigation and settlement, and the pressure brought to

bear upon the defendants as a result of those events." In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *57.

In light of the more difficult discovery and the overall higher degree of risk faced by the plaintiffs in these Actions, an award slightly higher than that granted in the Mutual Funds Cases is reasonable.

*(6) Public Policy*

Public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation. See In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2005) ("In order to attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so, it is necessary to provide appropriate financial incentives."). As Judge Holwell explained in Hicks, 2005 U.S. Dist. LEXIS 24890,

> Private actions to redress real injuries further the objectives of the federal securities laws by protecting investors and consumers against fraud and other deceptive practices.  Such actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class.  Due to the dispersed, and relatively small, losses among a large pool of investors, the class action mechanism and its associated percentage-of-recovery fee award solve the collective action problem otherwise encountered by which it would not be worthwhile for individual investors to take the time and effort to initiate the

action.  To make certain that the public is represented
by talented and experienced trial counsel, the
remuneration should be both fair and rewarding. The
concept of a private attorney acting as a private
attorney general is vital to the continued enforcement
and effectiveness of the Securities Acts.
Id. at *26-27 (citation and internal quotations omitted).

Here, where many if not most Class Members are
individual investors, public policy supports an award
sufficient to encourage  counsel to act on behalf of such
investors. See In re Bristol-Myers Squib, 361 F. Supp. 2d at
236; In re VisaCheck/Mastermoney, 297 F. Supp. 2d at 524
("The fees awarded must be reasonable, but they must also
serve as an inducement for lawyers to make similar efforts
in the future.").  An award of fees in excess of that
required to encourage class litigation, however, does not
necessarily serve public policy.

Here, the requested fee of 24% translates to an
aggregate rate of $912.80 for every hour of legal and
paraprofessional work expended during this litigation. This
rate, though substantial, is less than the hourly rate of
$959 that resulted from the award of 22.5% in the Mutual
Fund Cases.  Thus, I find that the fee requested by counsel
is certainly sufficient to provide proper incentive to class
counsel to undertake securities class actions but is not
exorbitant.  Accordingly, public policy concerns do not

weigh against an award of fees of the percentage that counsel has requested.

*Lodestar Cross-Check*

Even in cases where the court applies the percentage method of fee calculation, documentation of hours remains a useful "cross-check" on the reasonableness of the requested percentage. Goldberger, 209 F.3d at 50. Nevertheless, "where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court. Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case . . . ." Id.  Under the lodestar method of fee computation, a multiplier is typically applied to the lodestar. In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. at 467-68.  The multiplier represents the risk of the litigation, the complexity of the issues, the contingent nature of the engagement, the skill of the attorneys, and other factors.  Id.

Counsel have provided an account of the hours worked during this litigation by the partners, associates, and paraprofessionals from the firms of Lead Counsel.  A total of 35,051.26 hours were expended during the litigation, for total billed charges, or a "lodestar", of $16,116,234.75.  Counsel's requested fee of 24% of the

56

Settlement Fund represents a multiple of approximately 1.985 of the aggregate loadstar.

Counsel's lodestar represents an aggregate hourly rate of approximately $460.  The rates charged by the Lead Counsel firms, though high, are not inordinate for top-caliber New York law firms. See Williamsburg Fair Hous. Comm. v. N.Y. City Hous. Auth., No. 76 Civ. 2125, 2005 U.S. Dist. LEXIS 5200, at *35 (S.D.N.Y. Mar. 31, 2005) (observing that "a recent billing survey made by the National Law Journal shows that senior partners in New York City charge as much as $ 750 per hour and junior partners charge as much as $ 490 per hour") (citing In Focus:  Billing;  A Firm-by-Firm Sampling of Billing Rates Nationwide, Nat'l Law Journal, December 6, 2004, at 22)).

As in the Mutual Fund Cases, the time records submitted by Lead Counsel reveal that senior personnel performed a sizeable percentage of the work in this litigation.[11]  Approximately 45% of the total hours billed in this case were billed by partners or senior associates,

---

[11]Pursuant to the Court's Case Management Order #3, during the course of this litigation Lead Counsel firms have provided quarterly accountings of their work, including detailed time sheets that list the tasks engaged in by each attorney.  In addition, Lead Counsel have submitted a compendium of final time reports, reflecting work performed through June 15, 2007, in which the hours worked are broken down by personnel for each firm, and by category of the tasks performed.

at a rate of $500 or more per hour.  Although significant,
the percentage of hours expended by senior personnel in
these Actions is less than that expended in the Mutual Fund
Cases, where approximately 59% of the total hours were
billed at a rate of $500 or more per hour.  In addition,
here, as in the Mutual Fund Cases, the time sheets submitted
by counsel show that the relatively heavy participation of
senior personnel was justified, because the large majority
of the hours worked were spent on complicated tasks, such as
the drafting of pleadings and motions, and conducting
extensive settlement negotiations.  There is no indication
that counsel failed to delegate work, where appropriate, to
more junior personnel. Compare FTR Consulting Group, Inc. v.
Advantage Fund II, Ltd., 2005 U.S. Dist. LEXIS 20013, at
*17-18 ("It would appear that a substantial amount of this
work could have been performed by associates or paralegals
at significantly lower rates"); Klein ex rel. SICOR Inc. v.
Salvi, No. 02 Civ. 1862, 2004 U.S. Dist. LEXIS 4844, at *30
(S.D.N.Y. Mar. 26, 2004) (lowering counsel's lodestar
because of, inter alia, "inadequate delegation of work to
younger lawyers of tasks commonly performed by younger
lawyers at lower rates, and too much work being performed at
relatively higher hourly rates than should have been the
case" where "senior lawyers . . . performed the great bulk

58

of the work . . . at $ 550 and $ 525 per hour
respectively").   There is also no indication that counsel
performed unnecessary work.  The Court credits counsels'
representation that they took elaborate pains to ensure that
no duplicative work was performed during the course of the
litigation.

In cross-checking the requested percentage against
the lodestar, the Court must "confirm that the percentage
amount does not award counsel an exorbitant hourly rate." In
re Bristol-Meyers Squibb Sec. Litig., 361 F. Supp. 2d at 233
(citing In re NASDAQ Market-Makers Antitrust Litig., 187
F.R.D. 465, 486, 489 n.24 (S.D.N.Y. 1998) (internal
citations omitted)).  Here, as noted above, the requested
percentage of 24% of the Settlement Fund translates to a
multiple of counsel's lodestar of 1.985 and to an aggregate
hourly rate of $912.80.  In the Mutual Fund Cases, the Court
reduced the requested fee percentage so that the award
resulted in an aggregate hourly compensation of $959, which
was deemed to be a "princely rate of pay, by any standard"
but ultimately reasonable. In re Merrill Lynch Research
Reports Sec. Litig., 2007 U.S. Dist. LEXIS 9450, at *78.
The hourly rate of $912.80 is generous but reasonable, when
contrasted with the higher rate of compensation obtained by
counsel in the Mutual Fund Cases, in light of the greater

risk faced by plaintiffs at the outset of this litigation, the greater difficulty encountered in undertaking discovery, and the larger size and complexity of the overall litigation.  Similarly, a multiple of 1.985 of counsels' lodestar, which is slightly higher than the 1.95 multiple that resulted in the Mutual Fund Cases, is justified, in light of the factors that distinguish the two litigations.

*Objections to Requested Fees*

Two individual investors and one institutional investor have objected to counsels' request for attorneys' fees.  Each objection is examined in turn.

*Brian Fitzpatrick*:  Mr. Fitzpatrick, who also objected to the fairness of the Settlement, states that the Court should award no more than 15% of the settlement fund. He cites to an article in the Journal of Empirical Legal Studies for the proposition that the median percentage of a settlement in class action suits, where the settlement range is $79 to $190 million, is 15%.  Mr. Fitzpatrick notes that the settlement has occurred relatively early in litigation and that the requested percentage award would result in a windfall to counsel.

Mr. Fitzpatrick's objection is without merit.  The legal scholarship cited by Mr. Fitzpatrick appears to review class action settlements as a whole and does not reflect the

"median" range of settlement for securities class actions.
In any event, reference to settlement statistics in other
cases is of limited usefulness. See Goldberger, 209 F.3d at
53.  As discussed at length above, application of the
Goldberg factors in this case supports an award of 24%.

            *Tor Jernudd*:  Mr. Jernudd objects that a fee in
the amount of 30% of the Settlement Fund, which was the
maximum amount counsel was permitted to request as stated in
the Notice, is an "unreasonable sum that is disproportionate
both to the labor involved and to any harm suffered by us as
'class members.'" (Objection of Tor Jernudd.)  Mr. Jernudd
suggests that non-profit entities or governmental entities
are better suited to bring class actions on behalf of
injured shareholders.  He makes no substantive arguments
beyond these remarks.  Mr. Jernudd's objection does not
address counsels' actual request for 24% of the Settlement
Fund and is insufficient to weigh against approval of the
request as fair and reasonable.

            *New York State Teachers' Retirement System*:  The
New York State Teachers' Retirement System (the "NYSTRS"),
whose counsel addressed the Court at the Fairness Hearing,
objects that the percentage of the Settlement Fund awarded
as attorneys' fees in these Actions should be no greater
than the percentage awarded in the Mutual Fund Cases and,

based on Second Circuit precedent, should in fact be
significantly less.  The NYSTRS cites to numerous cases in
the Second Circuit in which courts have awarded
substantially less than 30% of settlement funds.  The NYSTRS
also states that counsels' lodestar is suspect and "may be
inflated by unnecessary and duplicative work by numerous
counsel battling over what is essentially the same turf."
(Objection of New York State Teachers' Retirement System at
5.)

        The NYSTRS' arguments have no merit.  As discussed
above, the mere fact that courts have awarded lower fees in
several other cases does not weigh against an award of a 24%
fee in this case.  The NYSTRS has not engaged in any
analysis of the Goldberger factors, as applied to the facts
of this case.  Further, as explained at length in this
Order, a fee of 24% in these Actions, which represents a
modest increase of the percentage awarded in the Mutual Fund
Cases, is justified based on material differences between
the two litigations.  Finally, there is no support for the
suggestion that counsels' time records may reflect
duplicative or unnecessary labor.  It is clear, both from
the Lead Counsels' Joint Declaration and the individual
attorney affidavits submitted by each of the eight Lead
Counsel firms, that Lead Counsel took pains to avoid

unnecessary work in this case, for example, by creating a
master set of allegations that were used in each complaint
in the twenty Actions.  In sum, the NYSTRS' objection does
not weigh against an award of 24% of the Settlement Fund.
*Reasonable Fee Award*

After applying the Goldberger factors and
considering counsels' lodestar, the Court finds that an
award of 24% of the Settlement Fund constitutes a reasonable
fee.  This award will result in a fee of approximately
$31,994,609, as of June 15, 2007, which equates to a
reasonable lodestar multiplier of approximately 1.985 and a
high but not exorbitant hourly rate of pay of $912.80.

**(iv) Reimbursement of Litigation Expenses**

Counsel request reimbursement of $1,376,255.97 in
litigation costs and expenses.  Counsel is entitled to
reimbursement from the common fund for reasonable litigation
expenses. Miltland Raleigh-Durham v. Myers, 840 F. Supp.
235, 239 (S.D.N.Y. 1993) (quoting Reichman v. Bonsignore,
Brignati & Mazzotta, P.C., 818 F.2d 278, 283 (2d Cir.
1987)).

Counsels' application is for an amount less than
that stated in the Notice, which provided that the request
for reimbursement of expenses would not exceed $1,750,000.
Expenses incurred in litigating these actions, included

"appeal costs, travel, experts, the costs of retaining a
respected neutral for the adversarial allocations
proceedings, reproduction/duplication, phone/fax/postage,
messenger/overnight delivery, and filing fees." (Mem. Attny
Fees at 17.)  Each of the Lead Counsel firms has submitted a
line-item accounting of expenses incurred during the
litigation.  No Class Members have objected to the expenses
claimed.  The expenses submitted by counsel are reasonable
and should be reimbursed in full out of the Settlement Fund.

**CONCLUSION**

For the foregoing reasons, the Court grants
certification to the settlement classes and approves the
Settlement and Plan of Allocation as fair and reasonable.
Plaintiffs' remaining claims are dismissed with prejudice.
Counsel are awarded attorneys' fees in the amount of 24% of
the Settlement Fund and reimbursement of costs and expenses
in the amount of $1,376,255.97.

The Court will enter an Order and Final Judgment,
to be submitted by counsel, confirming and finalizing
itsapproval of the Settlement and its award of fees and
expenses consistent with all of the proceedings in this case

and this Opinion and Order.  Attorneys' fees and expenses
are to be administered pursuant to the terms of the Order
and Final Judgment.


SO ORDERED.

Dated: New York, New York
       September 5 , 2007


                              JOHN F. KEENAN
                      United States District Judge