**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------X
                                   :
In re MERRILL LYNCH & CO. RESEARCH :
REPORTS SECURITIES LITIGATION      :
                                   :
-----------------------------------X   OPINION AND ORDER
                                   :   02 MDL 1484
This Case Relates To:              :   07 CIV 6677 (JFK)
                                   :
RONALD VENTURA,                    :
          Plaintiff,               :
                                   :
     - against -                   :
                                   :
MERRILL LYNCH & CO., INC., MERRILL :
LYNCH, PIERCE, FENNER & SMITH, INC.:
and HENRY BLODGET,                 :
              Defendants.          :
-----------------------------------X
```

<u>APPEARANCES</u>:

        <u>For the Plaintiff:</u>
             LAW OFFICE OF CHRISTOPHER J. GRAY, P.C.
             460 Park Avenue
             21st Floor
             New York, New York 10022
                 Of Counsel: Christopher J. Gray, Esq.

        <u>For the Defendants:</u>
             SKADDEN, ARPS, SLATE, MEAGHER & FLOMM, LLP
             Four Times Square
             New York, New York 10036
                 Of Counsel: Jay Kasner, Esq.
                           Scott Musoff, Esq.
                           Joanne Gaboriault, Esq.

**JOHN F. KEENAN, United States District Judge.**

**JOHN F. KEENAN, United States District Judge:**

      Plaintiff Ronald Ventura ("Ventura"), a purchaser of common stock in the Internet holding company, CMGI, Inc.

1

("CMGI"), brought this action against defendants Merrill Lynch & Co., Inc. ("Merrill Lynch"), Merrill Lynch's broker-dealer affiliate, Merrill Lynch, Pierce, Fenner & Smith, Inc. ("MLPF&S"), and Henry Blodget, a former Merrill Lynch executive and research analyst ("Blodget") (collectively, the "Defendants"), alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5, as well as common law fraud.

Ventura alleges that, from December 1999 to October 2000, the Defendants issued research reports relating to CMGI that provided falsely rosy projections of CMGI's share price and gave "buy" and "accumulate" ratings for the company's stock even though Blodget, the primary author of the reports, privately believed that the stock did not deserve such ratings. The Complaint alleges that the Defendants, while issuing the reports, knew about but concealed the fact that CMGI faced serious cash liquidity problems. The Complaint further alleges that the Defendants published the false opinions in order to boost the share price of CMGI's common stock and thereby induce CMGI to give Merrill Lynch lucrative investment banking business. As a result of the fraudulent analysis contained in the reports, Ventura claims that CMGI's stock price became artificially inflated and subsequently dropped when the true extent of

CMGI's cash flow crisis was finally revealed, thus resulting in Ventura's financial losses.

Defendants have moved to dismiss the Complaint under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and Section 21D(b) of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). Because the Complaint fails to plead that the alleged false statements made by the defendants were the cause of Ventura's financial losses, Defendants' motion is granted and the complaint is dismissed with prejudice.

## BACKGROUND

Plaintiff Ventura, like numerous other investors, lost money after he speculated in the stock of CMGI, a new Internet holding company whose share price soared during the Internet bubble and then plummeted in the spring and summer of 2000, during the sector's spectacular collapse. Ventura now seeks to blame the Defendants for what are, in essence, his gambling losses. Counter to Ventura's allegations, the Defendants' research reports -- which form the very basis for the present claims -- contained on their face full disclosure about the volatility of CMGI's stock, repeatedly warned potential investors that CMGI's fate was co-extensive with that of the Internet sector as a whole, and frankly stated that it was difficult for the Defendants' analysts to provide an accurate, objective valuation of the company. Further, Ventura has failed to assert facts to establish that any portion of his losses was due to the Defendants'

alleged fraud, rather than to the collapse of the Internet sector as a whole or to other bad news about CMGI, apart from the company's liquidity problems, that the Defendants released to the marketplace. Despite his insistence that the Defendants were insincere in their favorable evaluation of CMGI's prospects, Ventura has failed to allege any facts that link the Defendants' allegedly fraudulent conduct to his financial losses.

The following facts are taken from the Complaint, documents referenced in or incorporated by the Complaint, and facts of which the Court may take judicial notice.[1]

*The Parties*

Plaintiff Ventura purchased and held the common stock of CMGI, a publicly traded "internet holding company

---

[1] In reviewing a Rule 12(b)(6) motion, the court may consider the following materials: "(1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003), aff'd in part, reversed in part sub nom., Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935 (2005). (citations omitted).

that develops, operates, and invests in other internet companies." (Compl. ¶ 1.)

Defendant Merrill Lynch is a multi-national holding corporation that provides investment banking, research and brokerage services through its broker-dealer affiliate, Defendant MLPF&S. Defendant Henry Blodget was a First Vice President of Merrill Lynch and the lead research analyst of the company's Internet Group, which covered companies in the Internet sector. Blodget was employed by Merrill Lynch from February 1999 until April 8, 2002.

*NYAG Investigation & Class Action Lawsuits*

In April 2002, the New York State Attorney General's Office (the "NYAG") filed an affidavit detailing its investigation into conflicts of interest between Merrill Lynch's Internet Group and its investment banking division. Specifically, the affidavit alleged that the Defendants regularly published misleading and/or false recommendations on Internet-based stocks in order to generate underwriting business for Merrill Lynch from the companies whose stocks were the subject of the falsely positive reports. The affidavit was offered in support of an application before the New York state courts for an order requiring Merrill Lynch employees to turn over documents and give testimony in the Attorney General's continuing investigation into whether defendants violated New York state law. In May 2002, Merrill Lynch entered into a settlement with the NYAG, in which the company agreed to pay a cash fine of $100 million.

The NYAG's highly publicized investigation into
Merrill Lynch's conduct and the subsequent settlement led to
the filing of numerous class action complaints against the
present Defendants in courts throughout the country, on
behalf of purchasers of approximately two dozen Internet-
based securities, including CMGI, that had been the subject
of the allegedly fraudulent Merrill Lynch research reports
(the "Internet Cases").  In October 2002, the Judicial Panel
on Multidistrict Litigation transferred the cases to Judge
Pollack for pre-trial proceedings, under the caption <u>In re</u>
<u>Merrill Lynch Research Reports Securities Litigation</u>, No. 02
MDL 1484.

In December 2002, Judge Pollack issued an order
directing that the cases be consolidated according to the
security that was the subject of each complaint.  With
regard to seven different lawsuits brought by purchasers of
CMGI's stock, the order provided that those actions were to
be consolidated under one lead case entitled <u>In re Merrill</u>
<u>Lynch & Co., Inc. CMGI Inc. Research Reports Securities</u>
<u>Litigation</u>, No. 02 Civ. 7218.  In March 2003, the lead
plaintiffs filed consolidated amended complaints in each of
the actions.  In April 2003, the Defendants filed motions to
dismiss the complaints in cases brought by direct purchasers
of common stock in the Internet companies 24/7 Real Media
and Interliant.  Judge Pollack stayed all proceedings apart
from the motions to dismiss in the 24/7 Real Media and
Interliant actions, which were designated by Judge Pollack

as "test cases." <u>See</u> <u>In re Merrill Lynch 24/7 Real Media</u>
<u>Inc. Research Reports Sec. Litig.</u> No. 02 Civ. 3210 (MP), and
<u>In re Merrill Lynch Interliant Inc. Research Reports Sec.</u>
<u>Litig.</u>, No. 02 Civ. 3221 (MP) (the "test cases").  On June
30, 2003, Judge Pollack dismissed the complaints in the test
cases with prejudice, on the ground, among others, that the
plaintiffs had failed adequately to plead loss causation.
<u>See</u> <u>In re Merrill Lynch & Co. Research Reports Sec. Litig.</u>,
273 F. Supp. 2d at 351.[2]  On January 20, 2005, the Second
Circuit affirmed Judge Pollack's dismissal on the ground
that the plaintiffs failed to plead loss causation. <u>See</u>
<u>Lentell v. Merrill Lynch</u>, 396 F.3d 161, 178 (2d Cir. 2005),
<u>cert. denied</u>, 546 U.S. 935 (2005) ("<u>Lentell</u>").

Subsequently, the lead plaintiffs in the Internet
Cases entered into settlement negotiations with the
Defendants.  In January 2007, the parties entered into a
stipulation setting forth the key terms of a proposed
settlement.  On September 5, 2007, this Court approved the
final settlement of the Internet Cases.  <u>See</u> <u>In re Merrill</u>
<u>Lynch & Co. Research Reports Sec. Litig.</u>, No. 02 MDL 1484,
2007 U.S. Dist. LEXIS 65372 (S.D.N.Y. Sept. 5, 2007).
Ventura, a potential member of the class of plaintiffs who
purchased shares of CMGI stock during the class period,

---

[2] On October 6, 2004, following Judge Pollack's death, the
Judicial Panel for Multidistrict Litigation reassigned the
cases consolidated in <u>In re Merrill Lynch & Co., Inc.</u>
<u>Research Reports Sec. Litig.</u>, No. 02 MDL 1484, to this
Court.

opted out of the settlement. Ventura filed the present
Complaint on July 23, 2007.

*The Research Reports*

During the "relevant time period," which the
Complaint defines as running from December 20, 1999 to
October 4, 1999, (Compl. ¶ 30), the Defendants issued
approximately one dozen research reports that related to
CMGI.[3] The reports, which are expressly referenced
throughout the Complaint, fall into two general categories:
first, sector-wide reports that contained analyses of the
Internet industry and each company in the sector covered by
Merrill Lynch, including CMGI; and second, reports that
focused exclusively on CMGI that took the form of comments,
bulletins and notes, which were generally issued in response
to news from CMGI or new developments or trends affecting
the company.[4]

The reports that related exclusively to CMGI
variously contained descriptions of CMGI's business model
and the operations of its several subsidiary Internet
companies, as well a section, entitled "Investment
Highlights," that summarized the company's recent notable

---

[3] The reports were principally authored by Blodget and
published and disseminated by Merrill Lynch through MLPF&S.

[4] "The Court may consider the reports and draw reasonable
inferences from them, and accompanying text, because they
are the very data that plaintiffs allege was misleading,
they are integral to the complaints, and they were known to
or in the possession of plaintiffs and utilized in framing
the complaints." In re Merrill Lynch & Co. Research Reports
Sec. Litig., 273 F. Supp. 2d at 360 n.18.

business activities.  The reports also contained financial data that CMGI provided, including quarterly revenue and cash flow information, as well as stock data and stock performance charts.   In addition, many of the reports included Merrill Lynch's analysts' valuations of CMGI's subsidiary holdings, from which, in turn, the analysts derived CMGI's overall Net Asset Value ("NAV").  Further, the reports analyzed CMGI's past performance, identified "key metrics" which Blodget and the other analysts believed to be important in valuing the company, and provided target projections for CMGI's future share price.  The reports also addressed "key issues" that the analysts believed made CMGI a high-risk investment and discussed the hurdles faced by CGMI as a company operating in the Internet sector.

        The analysts' calculations of CMGI's asset value, and the opinions expressed in the reports regarding projections of future earnings, profitability and share price, provided the bases for the recommendations given by the Defendants as to whether investors should purchase CMGI's stock.  Each of the research reports followed Merrill Lynch's uniform stock rating system and provided a rating for CMGI that consisted of a letter, followed by four numbers, in the form "x-#-#-#."  A code key was included in each of the research reports.  The initial letter (either A, B, C, or D) represented Merrill Lynch's assessment of the "Investment Risk Rating" associated with the stock.  CMGI, like all of the Internet-based stocks covered by Merrill

Lynch, received a "D" rating, which indicated a "high" level of investment risk and was the highest risk rating that the company gave.

The pair of numbers that followed the Investment Risk Rating signified the stock's "Appreciation Potential Rating." The first number indicated the stock's appreciation potential over the intermediate term (from 0-12 months). The second number indicated the stock's long-term appreciation potential (more than twelve months). The numbers signified the following estimates: 1 – BUY; 2 – ACCUMULATE; 3 – NEUTRAL; 4 – REDUCE; and 5- SELL.[5] In all of the research reports devoted exclusively to CMGI that were issued during the relevant period, CMGI was given a rating of "2-1," or "ACCUMULATE/BUY." According to Merrill Lynch, companies given a "2-1" rating had "good growth prospects in a promising sector" or were dominant sector leader[s]"; were on a "clear path to profitability within the next 12-18 months"; had sufficient cash "to reach profitability"; and had "a high likelihood of appreciating more than 20% in 1-2 years." (Compl. ¶ 15.)

The relevant period began on December 20, 1999, with Merrill Lynch's issuance of its initial research report on CMGI, in which the Defendants announced their initiation of coverage of the company and bestowed on CMGI's stock a

[5] The third number following the Investment Risk Rating, which is not relevant to any issue in this case, was the stock's "Income Rating." At all relevant times, CMGI's Income Rating was "9", which signified that the stock did not provide a cash dividend.

rating of "2-1", or "ACCUMULATE-BUY." In addition, the
Defendants set a 12-18 month share price target of $300 (or
$150 per share, after adjusting for a later two-for-one
stock split) which was three times CMGI's then-current NAV
of approximately $100 per share. The report also
characterized CMGI as a core Internet holding. On the day
the report was issued, CMGI was trading at approximately
$222.19 (or, approximately $111.10 after adjusting for the
later stock split). The day after the issuance of the
initial report, CMGI's share price rose to $270.25, a gain
of approximately 22% over the previous day's closing price,
in double normal trading volume. The sharp gain was a
testament to the great degree of influence wielded by
Blodget, who was perhaps the most widely read Internet
research analyst in the country.

Defendants issued additional research reports on
January 20, March 31, June 9, June 14, August 7, August 24,
and September 22, 2000 in which the favorable "ACCUMULATE-
BUY" recommendation was maintained. In addition, on April
17, 2000, Merrill Lynch published a sector-wide report in
which CMGI was given a rating of "1-1", or "BUY-BUY." In
the June 9, 2000 report, Defendants downgraded their 12-18
month share price projection for the company, from $150 to
$100 per share (after adjusting for the earlier stock
split). In the report issued on June 14, 2000, Defendants
stated CMGI had total liquid assets of $2.1 billion
(comprising cash and marketable securities) and opined that,

11

at CMGI's "current burn rate" of $75 million per month, the company's cash position would last "8-10 quarters." (Decl. of Scott Musoff in Support of Merrill Lynch & Co., Inc. and MLPF&S Motion to Dismiss the Complaint ("Musoff Decl.") Ex. 4 at CMGI 0018.) Defendants reiterated their 12-18 month share price projection of $100 per share. In the report issued on September 22, 2000, Defendants stated that CMGI had total liquid assets of $2.3 billion and that this cash position would last "8-9 quarters" in light of the company's July 2000 cash burn rate of $93 million per month. (Id. at CMGI 0038.)

The research report issued on October 4, 2000 forms the gravamen of Ventura's claim that the Defendants finally revealed risks they had previously concealed relating to CMGI's precarious cash position. In that report, Defendants maintained the "2-1", or "ACCUMULATE-BUY" rating but expressed certain reservations about CMGI, including the acknowledgment that "CMGI stock has been very weak recently, down 35% in the last two weeks," and that, "[a]s a proxy for the internet sector, CMGI gets hit doubly hard when the sector is weak." (Id. at CMGI 0045.) Alarmingly, the report stated that, in light of the recent marked decrease in the company's NAV and the resulting drop in share price, "improved stock performance would require multiple expansion, which is unlikely in this environment, especially because CMGI's cash position is starting to become an issue." (Id.) The report continued by stating

that the company's cash holdings (excluding marketable securities) were $654 million at the end of the previous quarter, a position that would "last about 7 months," thus requiring the company to "1) raise additional cash or 2) sell some of its holdings or marketable securities, which at end of July were valued at $1.6 billion, or 3) significantly reduce its cash burn." (Id.). The report concluded that improvements in CMGI's cash position would not occur unless CMGI "can illustrate that its operating divisions are making strong progress toward turning cash flow positive." (Compl. ¶ 88.) That same day, CMGI's stock "dropped 11.5% from a close on October 3, 2000 of $24.3125 to a close of $21.50 on October 4, 2000." (Id. ¶ 89.)[6]

*The Alleged Fraud*

Ventura does not allege that any of the revenue or cash flow information, or any other financial data, contained in the research reports was false. Rather, Ventura claims that Blodget issued falsely optimistic target projections for CMGI's share price and equally false recommendations to investors to "accumulate" and/or "buy" CMGI stock when, in fact, Blodget privately believed that CMGI overstated its revenues and faced a liquidity crisis, and that investors should not have bought the stock. Ventura alleges that the research reports

---

[6] The Complaint appears to misstate the relevant dates. The published history of CMGI's stock prices reveals that CMGI's stock closed at $24.31 on October 4, 2000 and closed at $21.50 on October 5, 2000.

contained false recommendations, and concealed the
Defendants' concerns about CMGI's inadequate cash position,
in order to boost CMGI's stock price and thus induce CMGI to
give Merrill Lynch lucrative underwriting business.  The
fraud was motivated, Ventura claims, by Blodget's and other
analysts' desire to obtain hefty bonuses, which were keyed
to the amount of investment banking business the analysts
brought to Merrill Lynch as a result of their issuance of
the disingenuously flattering research reports. Ventura
alleges that, because the stock recommendations were
designed to attract investment banking business, rather than
reflect the analysts' true opinion about the investment
value of CMGI,  the Defendants never issued any
recommendation for intermediate or long term appreciation
potential that was below a "3", and therefore "Merrill
Lynch's five-point system was a de facto three-point
system." (Compl. ¶ 22.)  The Complaint also alleges that
Blodget and other analysts vetted the research reports with
Merrill Lynch's investment bankers and CMGI's executives
before publishing them.  Thus, the Defendant's research
analysts, whom the Defendants represented to the public as
being objective in their evaluations of publicly-traded
stocks, in actuality served the interests of Merrill Lynch's
investment banking division.  Similarly, Ventura claims that
the research reports, which were supposed to reflect the
objective views of the research analysts, actually

"represented the views of Merrill Lynch investment bankers and CMGI senior management." (<u>Id.</u> ¶ 94.)

The Complaint cites to several email exchanges involving Blodget as the basis for the claim that Blodget did not believe in the positive price projections or "buy" and "accumulate" ratings he gave to CMGI. For example, the Complaint quotes from an email sent to Blodget on January 20, 2000, from Ilona Nemeth, an executive at CMGI's competitor, Doubleclick, in which Nemeth asked, "when u break out AdForce's [CMGI holding] affiliate revenue, what is left? Do you see CMGI double or triple-counting rev[enue] amongst all various companies – does anyone isolate this impact (Obviously, then compare to [Doubleclick] real revs) . . . ." (Compl. ¶ 64.) The Complaint alleges that Blodget, who was familiar with CMGI's financial statements and its revenue reporting practices, "did not dispute [Nemeth's] criticism directed at CMGI for double- or triple-counting revenue, or the criticism of 'what was left' when AdForce's affiliate revenue was broken out." (<u>Id.</u> ¶ 66.) Instead, the Complaint alleges that Blodget responded that "[t]he best approach to that stock [CMGI] is to blur vision and say 'long the internet.' Look to[o] close and it can scare you. Not so DCLK [Doubleclick]. Looking close is great . . . ." (<u>Id.</u>). Ventura alleges that "[t]his harsh, private assessment came only days after" Blodget named CMGI one of his "Stocks of the Year" and on the same day of the issuance of a favorable research report. (<u>Id.</u>) Thus, Ventura asserts

that, in light of Blodget's stated misgivings, the favorable ratings and projections contained in the research reports and in other public pronouncements made by the Defendants regarding CMGI were false. Similarly, the Complaint quotes from an exchange between Blodget and an individual named "Ghachem" on April 17, 2000, the same day that Merrill Lynch's report on the Internet sector was issued in which CMGI was given a "1-1" or "BUY-BUY" rating. The Complaint quotes "Ghachem" as telling Blodgett that the April 17, 2000 Internet sector report is "brilliant-inspiring." (Id. ¶ 79.) Blodget demurred, stating "I think 'brilliant' might have applied to a short note entitled 'SELL NOW' back in march, but we must make the best of it." (Id.) Thus, the Complaint alleges that, because "Blodget believed that CMGI should be sold and not bought, the April 17, 2000 Internet Sector report urging investors to buy CMGI was materially false and misleading." (Id. ¶ 80.)

*Reliance & Causation*

Ventura relies on the "fraud on the market" doctrine to allege reliance. The Complaint alleges that an efficient market existed at all relevant times for CMGI's publicly traded securities and that "CMGI regularly communicated with public investors via established market communication mechanisms . . . ." (Id. ¶ 112.) The Complaint further alleges that a presumption of reliance applies because "the market for CMGI securities promptly digested current information regarding CMGI from all publicly-

available sources and reflected such information in CMGI stock price." (Id. ¶ 113.)

The Complaint also includes a section entitled "Loss Causation," which alleges that Ventura relied on the falsely positive "buy" and "accumulate" ratings and the artificially high share price projection of $300 per share, or three times CMGI's then-current NAV, given to CMGI by Blodget, and thus purchased shares of CMGI at artificially inflated prices. Ventura claims that he suffered losses when the risks concealed by the Defendants materialized, "including without limitation on October 3 and 4, 2000, when Defendants first revealed concerns about CMGI's cash flow and cash burn rate." (Id. ¶ 103.) The Complaint asserts that "[t]he decline in CMGI's stock price was a direct and proximate result of the true facts concerning CMGI's cash position and the materialization of the undisclosed risk that CMGI would have liquidity problems finally being revealed to investors and the market." (Id. ¶ 105.)

**DISCUSSION**

*(I) Pleading Standard*

On a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996). In so doing, the court need not "accord legal conclusions, deductions or opinions couched as factual allegations a presumption of

truthfulness." <u>In re NYSE Specialists Sec. Litig.</u>, 503 F.3d 89, 95 (2d Cir. 2007) (quotations and alterations in original omitted). The issue on a Rule 12(b)(6) motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claim. <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986). A court should "read the complaint generously and draw reasonable inferences in favor of the pleader." <u>Cosmas v. Hassett</u>, 886 F.2d 8, 11 (2d Cir. 1989). To survive a motion to dismiss, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" <u>TSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 98 (2d Cir. 2007) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (2007)).

*(II) Section 10(b) & Rule 10b-5*

To slate a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, plaintiffs must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." <u>Lentell</u>, 396 F.3d at 172. Defendants have moved to dismiss the Complaint on the grounds that Ventura has failed adequately to plead loss causation and has not pleaded fraud with the particularity

required by Rule 9(b) and the Private Securities Litigation
Reform Act (the "PSLRA").

*(A) Causation*

*Reliance/Transaction Causation*

A securities-fraud plaintiff "must prove both
transaction and loss causation." <u>Lentell</u>, 396 F.3d at 172
(internal quotations and citations omitted).  To plead
transaction causation, which is akin to reliance, a
plaintiff need only allege that "but for the claimed
misrepresentations or omissions, the plaintiff would not
have entered into the detrimental securities transaction."
<u>Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.</u>,
343 F.3d 189, 197 (2d Cir. 2003).  Although Ventura does not
allege that he actually read the Defendants' research
reports or that he purchased CMGI's stock through MLPF&S, he
relies on a "fraud-on-the-market" theory to plead
transaction causation. <u>See</u> <u>Basic v. Levinson</u>, 485 U.S. 224,
247 (1988).  "The fraud-on-the-market theory supposes that,
in an open and developed securities market, a company's
stock price is determined by the information about the
company and its business that is available to the market.
Thus, any misleading statements will be presumed to have
defrauded stock purchasers even if those purchasers cannot
show they have directly relied on the statements."
<u>60223 Trust v. Goldman, Sachs & Co.</u>, No. 03 Civ. 3548 (TPG),
2007 U.S. Dist. LEXIS 89646, at *22-23 (S.D.N.Y. Dec. 4,
2007).  Ventura has sufficiently pleaded that an efficient

market existed for CMGI's publicly-traded stock, that the market reacted to the allegedly false or misleading information published by the Defendants, and that Ventura relied upon the market price of CMGI, which reflected the Defendants' allegedly fraudulent information, when he purchased the stock at artificially inflated prices.

The Defendants protest that the record of Ventura's transactions in CMGI's stock reveals that he sold 17,500 shares of the company's stock on December 20 and 21, 1999, and thus did not in fact rely on the positive price projections and stock rating contained in the December 20, 1999 research report. Defendants' objection is unavailing. First, Ventura's history of stock sales is not mentioned or incorporated by reference in the Complaint, is not a fact of which judicial notice necessarily may be taken, and thus is a matter outside the pleadings that may not be considered on the present motion. Second, even if the Court were to consider these stock sales, they do not, standing alone, prevent Ventura from pleading transaction causation under the "fraud-on-the-market" doctrine. Defendants do not contest that Ventura has successfully pleaded that the market for CMGI's stock was efficient, that the Defendants' alleged misstatements artificially inflated the price of CMGI's stock, and that Ventura relied upon the market price of CMGI in purchasing the stock during the relevant time period – which includes dates and, presumably transactions,

apart from December 20 and 21, 1999.  Accordingly, I find
that the Complaint adequately pleads transaction causation.

*Loss Causation*

      "Loss causation is the causal link between the
alleged misconduct and the economic harm ultimately suffered
by the plaintiff." <u>Lentell</u>, 396 F.3d at 172. (internal
quotation marks omitted).  The concept of loss causation is
related to the doctrine of proximate cause. <u>See</u> <u>Merrill</u>
<u>Lynch & Co. v. Allegheny Energy</u>, 500 F. 3d 171, 183 (2d Cir.
2007).  A defendant's alleged "misstatement or omission is
the 'proximate cause' of an investment loss if the risk that
caused the loss was within the zone of risk concealed by the
misrepresentations and omissions alleged by a disappointed
investor." <u>Lentell</u>, 396 F.3d at 173.  To establish loss
causation, the loss must be foreseeable and the loss must be
caused by the "materialization of the concealed risk." <u>Id.</u>
"[A] plaintiff must allege . . . that the subject of the
fraudulent statement or omission was the cause of the actual
loss suffered, i.e., that the misstatement or omission
concealed something from the market that, when disclosed,
negatively affected the value of the security." <u>Id.</u>  Thus,
"the Second Circuit has made clear that in order '[t]o plead
loss causation, the complaints must allege facts that
support an inference that [defendants'] misstatements and
omissions concealed the circumstances that bear upon the
loss suffered such that plaintiffs would have been spared
all or an ascertainable portion of that loss absent the

fraud.'" <u>In re Initial Pub. Offering Secs. Litig.</u>, No. 21 MC 92 (SAS), 2008 U.S. Dist. LEXIS 24148, at *24 (S.D.N.Y. Mar. 26, 2008) (quoting <u>Lentell</u>, 396 F.3d at 175).

A plaintiff who cannot plead that a defendant's misstatements or omissions were the direct cause of his financial losses may nevertheless successfully allege loss causation by (i) "alleging that the market reacted negatively to a 'corrective disclosure,' which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted" or (ii) "alleg[ing] that a defendant's misstatements or omissions concealed a risk that later materialized to cause the plaintiff's loss." <u>In re AOL Time Warner, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing <u>Lentell</u>, 396 F.3d at 173, 175, 176).

In <u>Lentell</u>, the Second Circuit affirmed the dismissal of securities fraud claims brought by direct purchasers of stock in Internet companies who, like Ventura, claimed that the Defendants' falsely optimistic research reports caused the prices of the stocks at issue to become artificially inflated and resulted in the plaintiffs' losses. The Court of Appeals found that there was "no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of Merrill's 'buy' and 'accumulate' recommendations and no allegation that Merrill misstated or omitted risks that did lead to the loss." <u>Lentell</u>, 396 F.3d at 175. Plaintiffs' failure to

plead either corrective disclosure or materialization of a
concealed risk was "fatal under Second Circuit precedent."
Id. Although the Lentell court acknowledged that the
plaintiffs adequately pleaded that the alleged fraud caused
the investors to acquire the stocks at artificially inflated
prices, the court found that these facts at most could
"establish transaction causation; but they do not provide
the necessary causal link between Merrill's fraud and
plaintiffs' losses." Id. The court then observed that,
despite the plaintiffs' allegations that Defendants had
issued false and misleading "buy" and "accumulate"
recommendations, the research reports at issue were replete
with warnings about the high-risk nature of the investment,
and "the risk of price volatility -- and hence, the risk of
implosion -- is apparent on the face of every report
challenged in the underlying complaints." Id. at 176. The
court concluded,

> [W]here (as here) substantial indicia of the risk
> that materialized are unambiguously apparent on
> the face of the disclosures alleged to conceal the
> very same risk, a plaintiff must allege (i) facts
> sufficient to support an inference that it was
> defendant's fraud -- rather than other salient
> factors -- that proximately caused plaintiff's
> loss; or (ii) facts sufficient to apportion the
> losses between the disclosed and concealed
> portions of the risk that ultimately destroyed an
> investment.

Id. at 177.

Ventura attempts to satisfy the requirements of
Lentell by alleging that his losses resulted when the risk
concealed by the Defendants' fraudulent statements and
omissions materialized. Specifically, Ventura contends that

the present case is distinguishable from <u>Lentell</u>, because he
has alleged, first, that the Defendants concealed the risk
posed by CMGI's liquidity problems; second, that the risk
materialized on October 4, 2000, when the Defendants issued
a report that finally revealed their previously suppressed
concerns about CMGI's cash position; and third, that the
Ventura's losses were fully attributable to the alleged
fraud, rather than to other factors, because, immediately
following the release of the October 4, 2000 report, CMGI's
share price dropped 11.5% in heavy trading.   As the
Complaint states, "[t]he decline in CMGI's stock price was a
direct and proximate result of the true facts concerning
CMGI's cash position and the materialization of the
undisclosed risk that CMGI would have liquidity problems
finally being revealed to investors and the market." (Compl.
¶ 105.)

          Although Ventura is correct that he, unlike the
plaintiffs in <u>Lentell</u>, has alleged a specific risk that the
Defendants allegedly concealed (namely, CMGI's cash
liquidity problems), as well as its materialization (namely,
the issuance of the October 4 report), <u>Lentell</u> remains fatal
to the instant claims.   First, as in <u>Lentell</u>, the allegedly
fraudulent research reports in this case show, on their
face, that the risk that Ventura claims was concealed,
namely that "CMGI would have liquidity problems," in fact
was plainly revealed to Ventura and other investors.
Second, Ventura cannot successfully plead that his losses

resulted solely or even partially from the purported
materialization of the risk that the defendants allegedly
concealed, rather than from intervening causes, such as the
collapse of the Internet sector.  Thus, because Ventura has
not alleged facts to show that his losses were proximately
caused by the Defendants' purportedly fraudulent "buy" and
"accumulate" ratings or their alleged concealment of CMGI's
precarious liquidity position, he has failed to plead loss
causation.

*Absence of Concealment of Risk*

Here, as in <u>Lentell</u>, although "the defendant[s']
normative 'buy' or 'accumulate' stock recommendations were
insincere," they "were accompanied by the underlying,
accurate financial data, so that the plaintiffs could review
the financial information and evaluate the risk for
themselves." <u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d
147, 158 (2d Cir. 2007) (citing <u>Lentell</u>, 396 F.3d at 177).
As Ventura concedes, none of the statements of CMGI's
revenue or cash flow history, cash liquidity position, cash
burn rates, or any other financial data were misstated,
either by CMGI or by the Defendants.

In addition, "the risk of price volatility -- and
hence, the risk of implosion -- is apparent on the face of
every report challenged in the underlying complaint[]."
<u>Lentell</u>, 396 F.3d at 176.  Thus, as noted, the Defendants
bestowed a "D" rating on CMGI, which signified the highest
level of investment risk under Merrill Lynch's uniform

rating system.  CMGI received the "D" rating in each of the
research reports at issue.  The key code for the Defendants'
rating system was included in each of the research reports
and thus was readily available to Ventura and all other
potential investors in CMGI.  See id. ("Since the Investment
Opinions are decoded in the margin of every 'Bulletin' and
'Comment' cited in the underlying complaints, the high-risk
nature of the investment in 24/7 Media and Interliant was
available to the marketplace.").

　　　　Moreover, the Defendants' positive price
projections and stock ratings were accompanied by forceful
reminders that investment in CMGI's stock was a risky
proposition and that CMGI's prospects were co-extensive with
those of the Internet sector as a whole.  Far from
concealing the potential downside of investing in CMGI, the
reports frankly addressed the high degree of risk inherent
in purchasing the company's stock.  The reports
characterized the stock as "extremely volatile"; explicitly
stated that CMGI's holdings consisted largely of private
companies and that "[o]bviously, there is a large amount of
risk in private-market investing"; and cautioned investors
that "[o]ne of the risks for CMGI (and other large internet
holding companies) is scaleability:  as the company's
subsidiaries become large, global businesses, it will become
increasingly critical to hire and retain strong operating
managers."  (See, e.g., Musoff Decl. Ex. 4 at CMGI 0002-
0003.)  The reports also addressed the Defendants' "main

concerns about CMGI," citing "1) focus – the ability to manage subsidiaries and investments across such a wide range of sectors, and 2) the competitive positioning of some majority-owned companies . . . ." (Id. at CMGI 0002.)   At the conclusion of the December 20, 1999 research report, in a section headed by the word "Risks," which was printed in bold, the Defendants stated:  "Like all internet stocks, CMGI is an extremely risky investment.  The risks include: volatility (50% moves in either direction with no change in fundamentals are normal), integration (CMGI has been buying 2-5 companies a month for the last six months), and the health of the public market internet sector in general." (Id. at CMGI 0003)(emphasis added).

In addition, the research reports contained unequivocal language that cautioned investors that the fate of CMGI, a holding company for other Internet businesses, was essentially dependant upon the overall health of the Internet sector. The Defendants' initial research report, issued on December 20, 1999, warned that "CMGI's stock tends to trade as a proxy for the health of the Internet sector and Internet IPO market . . . . As long as the public market for internet stocks does well, CMGI probably will, too," and that "[i]f the Internet sector craters, of course, CMGI will crater along with it."  (Musoff Decl. Ex. 4 at CMGI 0001, 0003).

Further, counter to Plaintiff's contention that Defendants concealed the risks inherent in their allegedly

insincere valuation of CMGI's NAV and its projected share price, the reports expressly considered the difficulties faced by analysts in accurately assessing CMGI's NAV. In the December 20, 1999 report and in subsequent reports, Defendants stated that "CMGI is a complex company with many moving parts," (e.g., id. at CMGI 0003), and that "[v]aluing CMGI is difficult at best and futile at worst (estimated asset value plus option value leaves plenty of room for subjectivity)." (e.g., id.) In setting forth the procedure by which their analysts estimated CMGI's NAV, the Defendants warned that the factors used to arrive at a valuation "are highly subjective, and can make the stock look either outrageously expensive—or quite reasonable . . . ." (Id. at CMGI 0003).

Finally, it is undisputed that the Defendants accurately assessed CMGI's liquidity position as it changed, stating CMGI's holdings in cash and marketable securities in the reports dated June 14, 2000, August 24, 2000, and September 22, 2000. In these reports, Defendants provided assessments of how long CMGI's cash position would endure, given the company's recent "burn rate" of cash, and provided opinions about how CMGI could preserve or increase its liquidity. The reports reveal on their face that the Defendants did not suppress negative information about CMGI that was known to them all along, but rather provided candid, albeit hopeful, assessments of the company's changing fortunes as CMGI and much of the rest of the

Internet sector embarked on a precipitous decline beginning in the spring of 2000. For example, in the "Internet Sector Bulletin," issued on August 7, 2000, at a time when CMGI's stock had lost approximately 65% of its value from Defendants' initiation of coverage on December 20, 1999,[7] the Defendants undertook a realistic re-assessment of the marketplace, stating that "we are resetting the investment ratings for our internet universe"; that "capital is scarcer" and the "tide is no longer rising fast enough to lift all boats"; and that, as was reported in Merrill Lynch's June 7 sector-wide report, "the going will likely be tough for even the best internet stocks for the next year or two, as the companies must grow into their valuations." (Id. at CMGI 0024.)

Similarly, the Defendants revised their targets for CMGI's future share price as the Internet market experienced serious setbacks during the summer of 2000. For example, in the June 9, 2000 research report, Defendants gave CMGI a 12-18 month price objective of $100 per share, translating to a multiple of 2.4 of the company's NAV, down from Defendants' earlier projection of a $150 per share price and 3.0 multiple of NAV. In the report issued on September 22, 2000, Defendants stated that the company was

---

[7] The Court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment." Ganino v. Citizens Utilities Co., 228 F.3d 154, 167 n.8 (2d Cir. 2000).

trading at "1.0X estimated NAV of $36," but chose not to make any prediction regarding a future share price.

In sum, there was no materialization of any investment risk in the October 4, 2000 report that the Defendants concealed in the prior reports. The prior reports contained ample warnings that CMGI's stock was a high-risk investment that was subject to great price volatility, that the company's fortunes were tethered to those of the Internet sector as a whole, and that the company was difficult to value. The reports on their face contradict Ventura's claim that the Defendants knowingly concealed facts relating to CMGI's liquidity. Indeed, the October 4, 2000 report, which is the lynchpin of Ventura's "materialization of the risk argument," stated that CMGI had $654 million in cash as of the end of the July quarter and was "burning" cash at a rate of $93 million per month – the identical cash figure and "burn rate" that were set forth in the September 22, 2000 research report. Although Defendants expressed a concern over the cash position in the October 4 report that they did not express in the September 22 report, the mere negative characterization of existing facts that were never hidden from investors does not permit Ventura to plead loss causation. Ventura has "fail[ed] to grapple in any meaningful way with the complexity of the reports that form the basis of [his] claims or, for that matter, to account for the price-volatility risk inherent in" his decision to purchase and hold stock in CMGI. <u>Lentell</u>, 96

F.3d at 176. Accordingly, because the reports show on their face that the Defendants did not conceal the risk of investing in CMGI, Ventura has failed to plead loss causation.

*Failure to Attribute Losses to the Alleged Fraud*

Even assuming that the report issued on October 4, 2000 constituted the materialization of a risk that had been previously concealed, Ventura has failed to allege facts to show that the drop in CMGI's share price was attributable to the risk's materialization, rather than to the bursting of the Internet bubble or to other factors that are readily apparent from the face of the October 4, 2000 research report. The "logical link between [an] inflated share purchase price" resulting from alleged misstatements "and any later economic loss is not invariably strong" because "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions or other events." <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 342-43 (2005). To prove loss causation, plaintiffs must distinguish the alleged fraud from the "tangle of [other] factors" that affect a stock's price. <u>Id.</u> at 343. Although plaintiffs "need not quantify the fraud-related loss, they must 'ascribe some rough proportion of the whole loss to [the alleged] misstatements.'" <u>In re Omnicom Group, Inc. Sec. Litig.</u>, No. 02 Civ. 4483 (WHP), 2008 U.S. Dist. LEXIS

6033, at *20 (S.D.N.Y. Jan. 29, 2008) (quoting <u>Lattanzio</u>, 476 F.3d at 158).  Thus, a plaintiff cannot plead loss causation where the complaint fails to "allege[] facts to show that [defendant's] misstatements, among others . . . that were much more consequential and numerous, were the proximate cause of plaintiffs' loss . . . ." <u>Lattanzio</u>, 476 F.3d at 158.  In particular, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately ple[]d facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events." <u>Lentell</u>, 396 F.3d at 174.  As stated earlier, <u>Lentell</u> established that "where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud -- rather than other salient factors -- that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." <u>Id.</u>

In attempting to distinguish his Complaint from the fatally defective complaints in <u>Lentell</u>, Ventura relies on the affirmative allegation that CMGI's share price fell 11.5% on the day after the issuance of the October 4, 2000

research report, and contends that "Ventura (unlike the Lentell plaintiffs) has pleaded that 'the stock dropped when the bad news came out.'" (Pl. Mem. at 11, quoting DeMarco v. Lehman Bros., Inc., 309 F. Supp. 2d 631, 636 (S.D.N.Y. 2004). Ventura does not, however, allege facts to show that the price decline was due wholly or partly to the October 4 report's revelation about a previously concealed liquidity crisis, rather than to other causes.

The Complaint fails to account, for example, for the "crater[ing]" of the Internet market that occurred during the ten-month period when the reports were issued. As discussed, the reports themselves warned investors that the fate of CMGI, a company that owned numerous subsidiary Internet-based holdings, was dependant on the fate of the Internet sector as a whole. Here, as in Lentell, the Complaint does not assert facts that distinguish between the alleged fraud and the market-wide collapse of Internet stocks as the cause of Ventura's losses. Ventura's reliance on the price drop that occurred after the October 4, 2000 report came out, at a time when CMGI's stock had already lost a great portion of its value, is similar to the unavailing contention of the plaintiff in 60223 Trust v. Goldman, Sachs & Co., 2007 U.S. Dist. LEXIS 89646. In that case, the plaintiff investor alleged that the defendants' revelation that they had issued fraudulent research reports resulted in a drop in the price of the stock in which plaintiff had invested. In that case, however, as here, the

33

stock price had already sharply dropped in the months prior to the alleged materialization of the risk concealed by the fraud. In holding that the plaintiff had failed to plead loss causation, Judge Griesa reasoned as follows:

> The essential point is that by the time of the disclosures which allegedly caused the economic loss (as defined by the loss causation doctrine) the stock had already lost almost all its value -- declining from 24.75 on January 25 to 5.01 on June 14. The conclusion from all these circumstances is that the events of June 14 to June 21, which are said in the complaint to have brought about the economic loss, did not do so. The loss in value of the stock occurred gradually over the course of the entire class period, and the stock had lost most of its value before the June 14-21 events. This gradual loss of value occurred during the time when the alleged false and misleading comments of an optimistic nature were being issued. The complaint does not even refer to the phenomenon of the gradual loss of the stock's value, much less attempt to explain it as related to loss causation.

Goldman, 2007 U.S. Dist. LEXIS 89646, at *31.

Here, as in Goldman, the Complaint neglects to address the fact that, during the "relevant time period" while Defendants were issuing favorable "buy" and "accumulate" recommendations and rosy price target projections, CMGI's stock lost nearly all of its value. An examination of CMGI's stock performance reveals that, from December 20, 1999, when Defendants initiated coverage, to the issuance of the report on October 4, 2000, CMGI's share price dropped nearly 80%, from $111.10 (adjusted for the later split) to $24.31. Thus, the long, steady decline in value of CMGI's stock proceeded apace with the "crater[ing]" of the Internet sector, despite the positive ratings and

share price projections that Defendants' reports bestowed upon CMGI throughout 2000. As in Goldman, the present Complaint does not address the ten-month decline of CMGI's stock price and does not attempt to explain how the decline of the stock price following the issuance of the October 4, 2000 report was attributable to the alleged fraud, rather than simply a continuation of the loss in value that afflicted CMGI during the Internet sector's collapse. See In re Rhodia S.A. Sec. Litig., 531 F. Supp. 2d 527, 547 (S.D.N.Y. 2007) ("Where there are warnings about the steady decline of a publicly owned company, its shareholders cannot innocently claim ignorance about the true status of the company's financial health.")

Similarly, the Complaint does not account for the fact that the October 4, 2000 report contained other "bad news," apart from the concern about CMGI's cash position, that was likely to cause a drop in the company's share price and about which previous reports had warned investors. For example, the October 4, 2000 report reflected on the recent poor performance of CMGI's stock, noting that it was "down 35% in the last two weeks." (Musoff Decl. Ex. 4 at CMGI 0045.) In addition, the report also reminded investors that half of CMGI's NAV consisted of "publicly traded internet stocks" and thus CMGI's asset value declined as the Internet market declined. (Id.) Further, the Defendants reported that, in addition to the recent plunge in CMGI's stock price, "[w]e estimate NAV is now about $25, down from NAV of

$36 about two weeks ago." (<u>Id.</u>)  The report concluded with the rather grim assessment that, "We do not except the multiple [of NAV] to expand in an environment of worsening sentiment unless CMGI can illustrate that its operating divisions are making strong progress towards turning cash flow positive." (<u>Id.</u> at CMGI 0046.)

The distressing news regarding CMGI's plunging asset value and the Defendants' pessimistic assessment of the company's future prospects constituted the materialization of precisely the risks that the Defendants had warned investors about in earlier reports – namely, risks arising from the fact that CMGI's fortunes were tethered to those of the sector as a whole, that the stock was subject to great volatility, and that integration of many subsidiary Internet holdings could prove difficult. Ventura has failed to explain how the losses that occurred following the October 4, 2000 report resulted from the materialization of the purportedly undisclosed risk relating to CMGI's liquidity, as opposed to materialization of the aforementioned, clearly disclosed risks.  <u>See</u> <u>Liu v. Credit Suisse First Boston Corp. (In re Initial Pub. Offering Secs. Litig.)</u>, 399 F. Supp. 2d 298, 309 (S.D.N.Y. 2005) (stating that pleading loss causation requires plaintiffs to "meet a heavy burden of alleging specific losses that are connected to the risks that were actually concealed, rather than those risks that were disclosed by defendants in their cautionary statements"); <u>In re Omnicom Group, Inc. Sec. Litig.</u>, 2008

U.S. Dist. LEXIS 6033 at *20 ("Plaintiffs nevertheless cannot demonstrate that the market reacted negatively to the disclosures, rather than to other information simultaneously released to the market."). Ventura's attempt to plead loss causation fails because he has not alleged facts that lead to the inference that all, or even some, of his losses are due to the alleged fraud, rather than to intervening events and/or to the disclosure of other information.

*Ventura Cannot Plead Loss Causation*

Ventura has failed adequately to allege that the Defendants concealed the investment risk that purportedly materialized with the issuance of the October 4, 2000 research report. In addition, the Complaint fails to allege facts that support an inference that Ventura's financial losses were due to the alleged fraud, rather than to the collapse of the Internet sector and/or the materialization of investment risks that were disclosed in the prior reports issued by the Defendants. Accordingly, Ventura has failed to plead loss causation, and his claim under Section 10(b) and SEC Rule 10b-5 must be dismissed.[8]

*(III) Section 20(a)*

A claim for "control person" liability under Section 20(a) of the Exchange Act is "is necessarily predicated on a primary violation of securities law."

---

[8] Because Ventura has failed to plead loss causation, I need not decide whether the Complaint alleges facts with sufficient particularity to satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.

Rombach v. Chang, 355 F.3d 164, 177-178 (2d Cir. N.Y. 2004).
Because Ventura has failed adequately to plead a primary
violation of federal securities law under Section 10(b), the
Section 20(a) claim also must be dismissed. See id.

*(IV) Common Law Fraud*

"The pleading requirements for common law fraud
are essentially the same as those for claims under Section
10(b) and Rule 10b-5." See Internet Law Library, Inc. v.
Southridge Capital Mgmt., LLC, 223 F. Supp. 2d 474, 489
(S.D.N.Y. 2002). Because Ventura has failed to plead that
the Defendants' alleged fraud was the proximate cause of his
losses, his common law fraud claim also must be dismissed.
See Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d
Cir. N.Y. 1992) (affirming dismissal of a common law fraud
claim where the plaintiff failed adequately to plead that
the damages were proximately caused by the defendants;
misrepresentations); Joffee v. Lehman Bros., No. 04 Civ.
3507 (RWS), 2005 U.S. Dist. LEXIS 12313, at *43 (S.D.N.Y.
June 23, 2005), affm'd by Joffee v. Lehman Bros., 209 Fed.
Appx. 80 (2d Cir. 2006).

*(V) Leave to Replead*

Leave to replead shall "be freely given when
justice so requires." Fed. R. Civ. P. 15(a). "It is the
usual practice upon granting a motion to dismiss to allow
leave to replead," and "refusal to grant it without any
justifying reason is an abuse of discretion." Cortec
Industries, Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d

Cir. N.Y. 1991) (citations omitted).  Absent a showing of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or the futility of the amendment, a plaintiff should be granted leave to replead. See Protter v. Nathan's Famous Sys., Inc., 904 F. Supp. 101, 111 (E.D.N.Y. 1995) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  However, if an amendment would be futile, a court may deny leave to amend. See Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 168 (2d Cir. 2003) (citing Foman, 371 U.S. at 182). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." Id. (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)).

Here, it is evident that any amendment would be futile, in light of the information contained in the research reports which provide the basis for Ventura's claims.  As discussed, the reports show on their face that the Defendants repeatedly and clearly warned potential investors that buying CMGI's stock was a high-risk proposition, and that the investment risk that purportedly materialized was not, in fact, a concealed risk.  No amendment to the pleadings can evade the fact that the reports plainly disclosed the high risk of investing in CMGI.  In addition, no subsequent amendment can alter the fact that CMGI had lost most of its value by the time the alleged materialization of the risk occurred.  As discussed,

these facts are fatal to Ventura's attempts to plead loss
causation and cannot be overcome by amendment to the
Complaint.

In addition, although this is Ventura's initial
complaint and dismissal in such cases ordinarily would be
accompanied by permission for a second chance at meeting the
strict requirements for pleading securities fraud, Ventura
has had the benefit of following in the footsteps of the
class plaintiffs in the test cases. Judge Pollack's
dismissal of those cases, followed by the affirmance in
Lentell and subsequent related jurisprudence in both the
district courts and the Court of Appeals, have provided
Ventura with exhaustive instruction on what the Second
Circuit requires regarding the pleading of loss causation.
Ventura, in short, has had ample opportunity to distinguish
his claims from the claims that were rejected in Lentell.
Ventura's present failure to plead loss causation, after
receiving such instruction, strongly suggests that any
attempt to replead would be futile. Accordingly, leave to
replead is denied.

*(VI) Compliance with Rule 11(b)*

Pursuant to its statutory obligation under the
PSLRA, this Court finds that the parties and counsel in this
matter have complied with Rule 11(b). See 15 U.S.C. § 78u-
4(c)(1); Rombach, 355 F.3d at 178 ("The PSLRA mandates that,
at the end of any private securities action, the district
court must 'include in the record specific findings

40

regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'") (quoting 15 U.S.C. § 78u-4(c)(1)); <u>In re Sierra Wireless, Inc. Sec. Litig.</u>, 482 F. Supp. 2d 365, 382 (S.D.N.Y. 2007).

**CONCLUSION**

For the foregoing reasons, the Complaint is dismissed in its entirety with prejudice. The Clerk of the Court is respectfully directed to close this case.


SO ORDERED.

DATED:    New York, New York
          May  8 , 2008

                    _____
                    JOHN F. KEENAN
                    United States District Judge

47